FIFTH DIVISION

No. 1-06-2837

| | | |
|---|---|---|
| OMAR AGUIRRE, EDAR ZAVIER DUARTE SANTOS, and ROBERT GAYOL, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
|     Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| THE CITY OF CHICAGO, a Municipal Corporation; and CITY OF CHICAGO POLICE OFFICERS ROBERT RODRIGUEZ, CARLOS VELEZ, ALFONSO BAUTISTA, AL PEREZ, PAUL LOPEZ, and MICHAEL CHASEN, | ) ) ) ) ) ) ) | Honorable Daniel Locallo, Judge Presiding. |
|     Defendants-Appellants. | ) ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiffs filed a complaint against defendants alleging malicious prosecution. Following a trial, the jury returned a verdict for plaintiffs and, in answer to special interrogatories, found that defendants lacked probable cause and acted with malice when they prosecuted plaintiffs. Defendants appeal, raising two issues. First, defendants argue that the circuit court abused its discretion in admitting the testimony of the confessed murderer describing the crime. Second, defendants contend that the circuit court erroneously excluded evidence of the defendants' use of polygraph examinations to facilitate their investigation of the crime. For the following reasons, we affirm.

1

## BACKGROUND

In 2003, plaintiffs filed a complaint alleging that the defendants maliciously prosecuted them for the kidnapping and murder of Sindulfo Miranda. After amending their complaint and dismissing several defendants, the case proceeded to a jury trial against the named defendants.

Before trial, the circuit court made two decisions that are germane to this appeal. First, the circuit court ruled that when referring to polygraph examinations that were administered to some objects of the investigation, the witnesses and parties could not use the term "polygraph" to refer to the examinations or examiners. Further, the examination results could not be discussed. Instead, the circuit court ruled that officers would have to testify that a person submitted to further questioning from an independent interviewer at 1121 South State Street when discussing a polygraph examination. If deception was indicated, the circuit court directed the witness to say, "After questioning him, I wasn't satisfied. I wanted to question him further." In addition, witnesses were to refer to the polygraph examiners as police officers, and to the examinations as interviews. Second, the circuit court allowed the confessed murderer, Daniel Perez, to testify as to how and why he murdered Miranda and how his confession came to fruition.

The case then proceeded to trial and the following evidence was adduced at trial. In the early morning hours of July 18, 1997, police responded to a burning Mercedes near 33rd and Pulaski. After the fire was extinguished, police found the burned body of Miranda inside the burned Mercedes. Detectives Carlos Velez and Robert Rodriguez were assigned to the case. Early in the investigation, police determined that someone used Miranda's cell phone four times the night of the murder to call a pager.

On July 20, 1997, police interviewed Hector Cruz, who told police that on the morning of July 18, 1997, he was driving down 33rd Street and saw a two-tone maroon van parked next to a Mercedes. The van blocked his path down 33rd Street. A short, bald Hispanic man, standing 5 feet 3 inches, thin, and shirtless, but wearing shorts and gym shoes told Cruz to proceed down an alley. Suspicious, Cruz drove around the block and returned to the scene, where the van was gone but the Mercedes was ensconced in flames.

Later, police learned that Joey Baez owned a van similar to the one Cruz described, but after taking a polygraph examination, he was cleared of suspicion. Baez told police that Robert Toro had a van like the one described; however, Toro was cleared of suspicion after he passed a polygraph examination.

On October 21, 1997, police contacted Ronnie Gamboa, proprietor of Ronnie's Bar, to see if he knew what happened to Miranda. Gamboa agreed to a polygraph examination, which concluded that he was deceiving police when he told them that he last saw Miranda three weeks before the murder. As a result, police continued to investigate Gamboa. Meanwhile, they contacted Leticia Martinez, a bartender at Café Salsa who had told police that Miranda stopped at Café Salsa before going to Ronnie's Bar on the night of the murder, and asked her to submit to a polygraph examination. After doing so, the examiner concluded that deception was indicated and recommended further investigation of Martinez.

On November 6, 1997, police finally located Miguel LaSalle, to whom the pager, which Miranda's cell phone called the night of the murder, was registered. LaSalle testified that he was held in custody for five days. Initially, LaSalle told police that he had seen plaintiff Robert Gayol and Luis Ortiz, a member of the Latin Kings who LaSalle called "Pac-Man," in a

Mercedes the night of the murder. LaSalle also told police that the day after the murder, Gayol offered to sell him a cell phone, bracelet, and a ring with a blue stone, all of which Gayol told him he had taken from "some old guy" Gayol had "knocked."

On November 7, 1997, LaSalle took a polygraph examination, in which deception was indicated. Upon being confronted with this result, LaSalle changed his story. He now told police that plaintiff Edar Zavier Duarte Santos paged him on the night of the murder and told him to come up to Ronnie's Bar. Upon arriving at Ronnie's Bar, LaSalle told police, Santos informed him that Gamboa offered to pay him, Ortiz, and Gayol money to kill Miranda, who was sitting at the bar. LaSalle indicated that he then left the bar and stayed home the rest of the night. A month later he saw Santos, who was wearing a bracelet with "Miranda" in diamonds and who asked LaSalle for the cell phone that Gayol had sold to LaSalle, which had a wood-grain finish–the same kind of phone Miranda owned.

After hearing LaSalle's story, the police learned that Ortiz was in the 14th District lockup on an unrelated warrant, so they brought him to Area 4 and interviewed him early on November 8, 1997. Ortiz said that after he denied knowledge of the incident, detectives screamed at him and physically abused him in an attempt to get him to confess. Ortiz agreed to a polygraph examination, which indicated deception, and the examiner advised detectives to further question Ortiz. Ortiz claimed that the police continued to abuse him after the polygraph examination.

After the examination Ortiz gave police a statement, which included the following information. Ortiz told them that around 10:45 p.m. on July 17, 1997, he and Gayol smoked cocaine. He noticed that Gayol was wearing a gold watch, a gold ring with a blue stone, and had a cell phone, which Gayol explained he got from an old man. Around 1:30 a.m.on July 18, 1997,

the pair traveled to Ronnie's Bar, where Gamboa asked Gayol if he had killed Miranda yet. After being told "no," Gamboa told Gayol to "torch him" and reminded Gayol that the contract was for $25,000. Ortiz told police that Gamboa wanted Miranda killed because Gamboa did not want Miranda to take over his business. Ortiz said that Gayol told him that Aguirre, LaSalle, and Santos were involved in beating Miranda.

Ortiz then related that he and Gayol went to 33rd and Pulaski where Aguirre was waiting in a maroon van owned by Jose Chapa with Miranda tied up in the back of the van. According to Ortiz, Gayol placed Miranda in the Mercedes, poured paint thinner on Miranda, and lit him on fire. At trial, Ortiz testified that he made this statement only because he thought the police would release him and stop beating him. However, the assistant State's Attorney (ASA) stated that Ortiz told him that the police had treated him well and that Ortiz showed no signs of injury. After giving his statement, Ortiz was charged with murder. He eventually pled guilty in exchange for a 25-year sentence.

On November 9, 1997, police went to a garage behind 2737 W. Chanay Street, where they found Aguirre, Santos, Chapa, Domingo Ayala, and Hector Camacho. A maroon van that matched the description provided by Cruz was parked outside the garage. Detectives interviewed each of the men. All five men initially denied involvement in the murder. At trial, Chapa testified that he was kept at the police station for three days without anything to eat, physically abused, and threatened with jail time if he did not cooperate.

Meanwhile, Aguirre testified to numerous instances in which detectives physically abused him in order to obtain a confession. Aguirre also claimed that officers threatened that he would never see his children again. In addition, Santos testified that he saw a bruise on

5

Aguirre's side when he was transferred to lockup. However, Aguirre's criminal defense attorney testified that Aguirre's records revealed no signs of physical abuse.

Aguirre was interviewed again later on November 9, 1997, and suggested that he was working at Marcells Paper on the night in question. While records later showed that Aguirre did not work on the night of the crime, on November 9, 1997, the company's owner did not know whether Aguirre had worked on July 17, 1997. Aguirre eventually told police that he was at Ronnie's Bar on the night of the murder and witnessed Gayol, Santos, and Ortiz attack Miranda, after which Aguirre said that he went home.

Initially, Santos also denied involvement in the crime when he arrived at the police station and sought to verify this claim with records showing that he was at work at the time of the murder. Police interviewed Santos a second time on November 10, 1997, during which Santos admitted that he punched Miranda in the chest, but claimed he did not participate in tying him up nor did he know Miranda would be killed.

Sometime during the early afternoon hours of November 10, 1997, police escorted Gayol to Area 4 for questioning. Gayol denied any knowledge of the crime, even after police confronted him with information that implicated him in the crime. Gayol testified that police slapped him, kicked him, and refused to provide him with an attorney.

At the same time that police were interviewing Gayol on November 10, 1997, they interviewed Chapa again. This time Chapa told police that he saw Gayol, Santos, and Ortiz beat

Miranda. Chapa claimed that he told Aguirre that they should leave,[1] but Aguirre stayed. Chapa testified that he told police this story to avoid going to jail.

When confronted with Chapa's allegation, Aguirre reportedly slumped in his chair and nodded his head. After removing Chapa from the room, detectives interviewed Aguirre again. Aguirre claimed that police abused him and told him that if he wanted to go home, he needed to cooperate. Detective Lopez testified that after being confronted with Chapa, Aguirre gave a statement to police. In the statement, Aguirre told police that he saw Gayol, Santos, and Ortiz attack Miranda in Ronnie's Bar. Afterward, Aguirre told police that he left the bar, but returned a few hours later after being summoned by Ortiz. Aguirre said that he transported Miranda to 33rd and Pulaski in Chapa's van and waited for Gayol to arrive. Aguirre then told police that Gayol arrived at the scene, placed Miranda in the Mercedes, and lit it on fire. At trial, Aguirre testified that he signed the statement because he was told that he could go home if he did so. In fact, Aguirre testified that he signed a statement he could not understand because it was written in English, a language in which Aguirre is not fluent.

At 4 a.m. on November 11, 1997, an ASA took a written statement from LaSalle. In the statement, LaSalle stated that he overheard Gamboa ask Santos if Santos was ready to kill Miranda for $25,000. After Santos told LaSalle that he was going to get $8,000 to kill Miranda, LaSalle went home. LaSalle told police that he saw Gayol the next day and Gayol tried to sell him jewelry and a cell phone. On August 22, 1997, LaSalle claimed that Santos showed him a gold watch, a ring with a blue stone, and a gold bracelet with "Miranda" spelled in diamonds.

---

[1] Chapa later memorialized this story in a statement taken by an ASA on November 11, 1997.

After taking LaSalle's statement, police received Santos' consent to conduct a polygraph examination, which concluded that Santos was lying. Santos claimed that the examination was in English and that police refused to provide a translator. Furthermore, Santos contended that after the examination, the police threatened that if he did not cooperate, he would not be around to raise and support his family. Around 8 p.m. on November 11, 1997, an ASA interviewed Santos and told him that there were inconsistencies in his story. According to Santos, Detective Perez started this interview by saying that Santos had "five seconds to say something." The ASA added that this was the last chance for him to confess and if he wanted to say something, he had the chance. After Santos remained silent, the ASA told Santos that he had "three seconds" to say something before he never saw his family again. Upon hearing this, Santos told the ASA that he hit Miranda with a chair, punched Miranda, gagged Miranda, and helped load Miranda into the van. Santos indicated to the ASA that the police had not mistreated him. However, at trial, Santos testified that he told the ASA that story because he was scared.

After this last interview, the three plaintiffs were charged with Miranda's murder. Gayol was convicted after a bench trial and sentenced to natural life without the possibility of parole. Aguirre was convicted after a jury trial and sentenced to 55 years' imprisonment. Santos pled guilty and was sentenced to 12 years' imprisonment.

Five years after the investigation, Perez told federal authorities that he was involved in the kidnapping and murder of Miranda. At trial, Perez testified as follows. Perez was a member of the Latin Kings. He was asked by Richard Carman, a drug dealer, to help Carman and fellow gang member Omar Avila kidnap Miranda, who Carman believed was a rival drug dealer. Perez testified about when, where, and how the group beat and sodomized Miranda to death, and how

they burned him in a Mercedes on 33rd and Pulaski. Perez testified that Avila even burned his legs while setting the fire, a claim which was substantiated by Salmi Drunga, director of medical records at Norwegian American Hospital, who testified that files showed Avila received treatment for second-degree burns on his legs on July 18, 1997. Moreover, Perez testified that the group threw Miranda's jewelry–two rings and a bracelet with "Sindulfo" in diamonds–into Lake Michigan.

Finally, ASA Jennings testified that, as a result of Perez's confession to federal authorities, the Cook County State's Attorney's office nol-prossed the cases against plaintiffs. After the close of evidence, the jury returned a verdict for plaintiffs. Specifically, the jury awarded Gayol $740,000, Aguirre $3 million, and Santos $3 million. In addition, the jury found that defendants had lacked probable cause and had acted with malice.

## ANALYSIS

### I. Did the Circuit Court Abuse its Discretion in Allowing Testimony From Actual Killer?

Defendants contend that the circuit court abused its discretion in allowing Perez to testify about the circumstances regarding the kidnapping and murder of Miranda. Defendants claim that the evidence was irrelevant to whether defendants had probable cause to prosecute plaintiffs in 1997. Defendants also allege that the testimony lacked probative value for many reasons. In addition, defendants claim that any probative value was strongly outweighed by the prejudice done to them.

Actions for malicious prosecution are disfavored because public policy encourages the exposure of crime and cooperation from people with knowledge about crime. *Rodgers v.*

*Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 345, 733 N.E.2d 835, 840 (2000). To prove the tort of malicious prosecution, a plaintiff must demonstrate: (1) that defendants began or continued the original criminal proceeding; (2) plaintiff received a favorable termination; (3) probable cause did not exist; (4) malice was present; and (5) plaintiff suffered damages. *Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996). If one element is missing, the plaintiff is barred from pursuing the claim. *Swick*, 169 Ill. 2d at 512, 662 N.E.2d at 1242.

The plaintiff bears the burden to prove that the termination of proceedings was favorable for him. *Swick*, 169 Ill. 2d at 513, 662 N.E.2d at 1243. While the majority of jurisdictions recognize a prosecutor's abandonment of proceedings via a *nolle prosequi* as a favorable termination in favor of the accused, this is not true if the prosecutor abandons the proceeding for reasons not indicative of the accused's innocence. *Swick*, 169 Ill. 2d at 513, 662 N.E.2d at 1242-43. As our supreme court advised:

> "The abandonment of the proceedings is not indicative of the innocence of the accused when the *nolle prosequi* is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or impracticability of bringing the accused to trial." *Swick*, 169 Ill. 2d at 513, 662 N.E.2d at 1243.

Meanwhile, a plaintiff may demonstrate malice by showing that the prosecutor proceeded with the prosecution for the purpose of injuring plaintiff or for some other improper motive. *Turner v. City of Chicago*, 91 Ill. App. 3d 931, 937, 415 N.E.2d 481, 487 (1980). "Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith

1-06-2837

by the prosecutor and where the want of probable cause has been clearly proved." *Turner*, 91 Ill. App. 3d at 937, 415 N.E.2d at 487.

Here, defendants submitted a motion *in limine* seeking to bar introduction of any evidence regarding Perez or his testimony regarding the circumstances of the murder. Defendants claimed that because they were conceding that the charges were terminated in plaintiffs' favor, any evidence related to Perez's commission of the crime was irrelevant. Defendants argued that the fact Perez confessed five years after the investigation has no bearing on whether defendants acted maliciously. Furthermore, defendants averred that any probative value was substantially outweighed by prejudice, confusion of the issues, and the potential to mislead the jury.

Plaintiffs countered that Perez's testimony was relevant not only to the issue of favorable termination, but also the issue of malice. Regarding malice, plaintiffs argued that Perez's testimony would help establish their argument that their statements were procured through coercion and orchestrated by the police. Specifically, plaintiffs contended that police produced the false statements that plaintiffs later incorporated into their statements. Perez's testimony, plaintiffs argued, would demonstrate that Miranda's murder did not happen like plaintiffs stated in their statements. That testimony would indicate that the statements were false and, if false, then plaintiffs could connect the false statements with the officers. Plaintiffs contended that this would prove malice and make the testimony relevant.

The circuit court allowed plaintiffs to place Perez on the witness stand and have him testify about the events leading to Miranda's death. The circuit court explained:

11

"That if the theory is that these are false confessions and if the theory is that the only reason each of these statements parrot each other is because there was some activity to make sure that the statements are consistent when, in fact, these people never talked to each other, reasonable inference is going to be drawn. The fact that there's a difference in the facts, okay, with respect to where the murder occurred or how it occurred and what the condition of the body was before the fire started, that all goes to the jury looking at the circumstances and what's going on."

A circuit court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard. *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 452, 818 N.E.2d 713, 720 (2004). An abuse of discretion occurs when no reasonable person would rule as the circuit court ruled. *Kim*, 353 Ill. App. 3d at 452, 818 N.E.2d at 720.

In this case, the trial court did not abuse its discretion in allowing Perez to testify regarding the murder of Miranda. Perez testified that Carman recruited him and another fellow gang member to help Carman kidnap and murder Miranda. Perez discussed how they abducted Miranda, where they took him, what they did to him, and how they disposed of his body. Perez also discussed how Avila burned his legs lighting the Mercedes on fire, which helped corroborate his confession and testimony as truthful.

Veritably, Perez's testimony is relevant to prove the second element of malicious prosecution–that plaintiffs received a favorable termination of the proceedings. Evidence is relevant if it tends to make the existence of any fact important to the determination in the case more or less probable. *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 636, 873 N.E.2d 486, 508

12

(2007). Plaintiffs had the burden to prove that the State nol-prossed the charges because of their innocence. Perez's testimony, including specific details of the crime, helped establish this element. Defendants claim that Perez's testimony could not shed light on why the prosecutor dismissed the cases against plaintiffs, but this argument is incorrect. Clearly, one could infer from Perez's testimony that the State dismissed the cases against plaintiffs because Perez's detailed confession proved that plaintiffs were not culpable. A reasonable person could conclude that Perez's testimony was relevant because it tended to make it more probable that the proceedings were terminated favorably for plaintiffs. Therefore, the trial court did not abuse its discretion.

Perez's testimony is also relevant to the fourth element of malicious prosecution–the presence of malice. Plaintiffs sought to admit Perez's testimony to demonstrate that their statements were false. During the trial, plaintiffs also introduced evidence that they did not speak to each other during the interrogation process. Yet their confessions were remarkably similar. Thus, plaintiffs believed that the jury could infer that the only way each plaintiff's confession was so similar was if the police told each plaintiff what to say. This inference would help establish malice. The circuit court agreed with plaintiffs that Perez's testimony was relevant to prove malice, explaining:

"[T]he theory is that these are false confessions and if the theory is that the only reason each of these statements parrot each other is because there was some activity to make sure that the statements are consistent when, in fact, these people never talked to each other, reasonable inference is going to be drawn."

Defendants argue that this line of argument is only relevant if the jury were to pile inference upon inference. Defendants argue that the jury would first have to infer that Perez, not plaintiffs, committed the crime. Next, the jury would have to infer that the statements made by plaintiffs and the other witnesses during the investigation were untrue. Third, the jury would have to infer that the only explanation for the false statements is that defendants created them. Defendants contend that a jury cannot base a finding of fact on such speculation.

Defendants' argument is specious. There is no rule against basing one inference upon another inference so long as the chain of inferences does not become so tenuous that the final inference has no probative value. *Leavitt v. Farwell Tower Ltd. Partnership*, 252 Ill. App. 3d 260, 268, 625 N.E.2d 48, 54 (1993). Circumstantial evidence "is the *proof of certain facts and circumstances* from which the jury may infer *other connected facts* which usually and reasonably follow according to the common experience of mankind." (Emphasis added.) *Pace v. McClow*, 119 Ill. App. 3d 419, 423-24, 458 N.E.2d 4, 8 (1983). Perez testified that he committed the crime and testified to intricate details only the killer would know. Therefore, the jury could accept that Perez committed the crime by accepting his testimony; there is no need for the jury to draw an inference. If Perez committed the crimes then plaintiffs could not have committed them. This is the only logical conclusion that follows from Perez's admission. Likewise, the only logical and reasonable conclusion from Perez's testimony is that plaintiffs' confessions were false; if they were true, then Perez could not have committed the murder.

Perez's testimony also works in concert with other evidence plaintiffs presented to allow the jury to infer malice. Plaintiffs offered evidence that showed they were held in detention and could not have communicated with each other before the State filed charges. Yet each plaintiff's

14

version of events regarding the murder of Miranda–a crime which Perez, not plaintiffs, committed–was substantially similar.

When Perez's testimony is considered with the fact that plaintiffs never spoke to each other yet gave similar confessions, a reasonable inference could be made that the officers suggested facts and answers and, in essence, created the false statements made by plaintiffs. Therefore, plaintiffs have produced certain facts that support an inference of other facts of malice, which flow reasonably and naturally from the facts plaintiffs have proved. This is not a case where a contrary fact can be inferred with equal probability or where the chain of inferences becomes so tenuous that their probative value becomes nonexistent. Therefore, we conclude there was a reasonable basis upon which the circuit court could find that Perez's testimony was relevant.

Defendants' last argument is that the prejudicial impact of Perez's testimony far outweighs its probative value. Even if evidence is relevant, it should be excluded if its prejudicial impact substantially outweighs its probative value. See, *e.g.*, *People v. Walker*, 211 Ill. 2d 317, 337, 812 N.E.2d 339, 350 (2004). Defendants claim that Perez's testimony about events that transpired in 2002 became indistinguishable from what defendants knew when the investigation took place. Thus, the jury could not objectively look back at the 1997 investigation without incorporating Perez's graphic account of the crime into its evaluation. In addition, defendants contend Perez's testimony improperly injected plaintiffs' guilt or innocence into the trial, thereby increasing the chances that the jury would conflate the issue of plaintiffs' guilt or innocence with the issue of whether defendants had probable cause to prosecute plaintiffs.

1-06-2837

Whatever prejudice Perez's testimony had on the jury was mitigated by the circuit court's instruction to the jury that any events that took place after November 11, 1997, were irrelevant to the probable cause determination. In Illinois, the jury is presumed to have followed its instructions. *People v. Taylor*, 166 Ill. 2d 414, 438, 655 N.E.2d 901, 913 (1995). Here, the circuit court instructed the jury that when determining probable cause, it should only consider what the officers knew between July and November of 1997. Nothing in the record suggests that the jury failed to follow this instruction. Therefore, it is presumed that the jury followed the instruction. As a result, defendants have failed to persuade us that the prejudicial impact of Perez's testimony outweighed its probative value.

This presumption also applies to defendants' claim that Perez's testimony may have caused the jury to consider guilt or innocence when evaluating the probable-cause issue. The circuit court instructed the jury before deliberations that "[w]hen I use the phrase 'probable cause' *** it is the state of mind of [the] one initiating the prosecution and not the actual facts of the case or guilt or innocence of the accused that is at issue." Again, nothing in the record rebuts the presumption that the jury followed the instruction in finding in favor of plaintiffs. As a result, any prejudice from the testimony does not outweigh its probative value. Therefore, for all the foregoing reasons, we conclude that the circuit court did not abuse its discretion in allowing Perez to testify about Miranda's murder.

II. Did the Circuit Court Abuse its Discretion in Limiting the Use of Polygraph Evidence?

Next, defendants contend that the circuit court erred in excluding evidence regarding the polygraph examinations given to various witnesses and suspects. Citing several instances in

16

which the circuit court referred to the Illinois Supreme Court's rulings barring polygraph results, defendants claim that this issue is subject to *de novo* review because the circuit court excluded the polygraph evidence as a matter of law. Meanwhile, plaintiffs argue that the correct standard of review is abuse of discretion because the circuit court made an evidentiary ruling.

We believe that the applicable standard of review is abuse of discretion. It is true that precedent dictates that evidence of polygraph results is inadmissible. However, those cases were based on the finding that the process of recording the polygraph's results and then correctly interpreting those results has not become sophisticated enough to make the evidence more probative than prejudicial. See, *e.g.*, *People v. Baynes*, 88 Ill. 2d 225, 239, 430 N.E.2d 1070, 1077 (1981). In addition, the appellate court has found that "the polygraph has attained a stature and an acceptance in the public mind [far] in advance of that achieved in the world of jurisprudence," further heightening the prejudicial effect of such evidence. *McGowen v. City of Bloomington*, 99 Ill. App. 3d 986, 990, 426 N.E.2d 328, 331 (1981). Therefore, the circuit court's decision to exclude some polygraph evidence in this case was an evidentiary decision, subject to an abuse of discretion standard of review. *Kim*, 353 Ill. App. 3d at 452, 818 N.E.2d at 720.

Here, the circuit court precluded defendants from discussing certain evidence related to the investigatory polygraph examinations they conducted on suspects during their investigation. Specifically, the circuit court ordered defendants and their witnesses to use the following language when the witnesses wanted to indicate that a suspect was given a polygraph examination: that he or she spoke "to an independent interviewer at 1121 South State Street." Further, polygraph examiners were to be referred to as police officers or independent

interviewers and there was to be no discussion about the results of such examinations. Instead, if deception had been indicated, witnesses were to say that the interview "called for further questioning" and that some questions needed to be resolved.

Based on this language, defendants argue that the jury was not permitted to hear the full story. Particularly, defendants claim that "interviews" did not give the evidence sufficient weight nor did the permitted language allow the jury to know that deception was indicated. The circuit court, however, substantially analyzed case law and the parties' arguments in addressing defendants' concerns. Indeed, the circuit court did not bar all evidence of the polygraph or its results, but only the explicit reference to the fact of the polygraph examination and its results.

This still allowed defendants to present this part of their investigation to the jury, albeit implicitly through reference to "1121 South State Street" for "further questioning," and, when the examination showed deception, that the officers were not satisfied and pursued further questioning. Thus, defendants were allowed to tell the jury that certain suspects or witnesses were taken to a separate location to participate in further interviews. If the interviewers did not believe a suspect's story, defendants were allowed to tell the jury about this conclusion, which led to further interviews or investigation. Instead of completely barring any and all evidence related to the polygraph examinations, the circuit court used its discretion to make a measured decision, which allowed defendants to demonstrate why they continued to pursue plaintiffs without prejudicing the jury.

Defendants contend that these alternative terms cannot substitute for the gravitas associated with the fact of a polygraph examination and its results. But this is exactly what the circuit court, and other courts in Illinois, feared and sought to prevent–that juries would ascribe

too much weight to a process that has proven unreliable. Indeed, when explaining the rationale behind its ruling, the circuit court said:

> "Somebody could be cross-examined as to [their motive, bias, and reasonableness]. With a machine you can't cross-examine if somebody's interpreting the way somebody's blood pressure was or pulse was, okay, respiration. And one of the dangers of a polygraph is that the fact finder will take the results of the exam and it will eat away the ability to assess the credibility."

Defendants cite two cases in particular to support their position. First, defendants cite *Criss v. Springfield Township*, 56 Ohio St. 3d 82, 564 N.E.2d 440 (1990). In *Criss*, the plaintiffs had been unsuccessfully prosecuted for rape, and after acquittal, brought a malicious prosecution action against the defendants. *Criss*, 56 Ohio St. 3d at 84, 564 N.E.2d at 442-43. Before the jury trial, the trial court precluded the defendants from admitting evidence of the plaintiffs' polygraph examination results. *Criss*, 56 Ohio St. 3d at 84, 564 N.E.2d at 442. The appellate court reversed and remanded, ruling that the trial court erred in excluding the polygraph evidence. *Criss*, 56 Ohio St. 3d at 88, 564 N.E.2d at 445. The Ohio Supreme Court affirmed the appellate court's ruling, concluding that a limiting instruction would eliminate any danger that the jury would consider the polygraph evidence for anything other than determining the defendants' state of mind. *Criss*, 56 Ohio St. 3d at 87, 564 N.E.2d at 445.

We refuse to follow *Criss* for two reasons. First, decisions from foreign jurisdictions do not bind this court. See, *e.g.*, *Mount Vernon Fire Insurance Co. v. Heaven's Little Hands Day Care*, 343 Ill. App. 3d 309, 320, 795 N.E.2d 1034, 1044 (2003). Second, we believe that Illinois precedent provides a more reasoned assessment of the prejudicial impact of polygraph evidence.

1-06-2837

See, *e.g.*, *Kaske v. City of Rockford*, 96 Ill. 2d 298, 450 N.E.2d 314 (1983) (finding that the sophistication of polygraph examinations has not improved to where its probative value outweighs its prejudicial impact). Therefore, we do not find *Criss* to be persuasive or controlling authority.

The second case to which defendants cite is *Moskos v. National Ben Franklin Insurance Co.*, 60 Ill. App. 3d 130, 376 N.E.2d 388 (1978). In *Moskos*, the insured plaintiff brought an action for damages based on the insurer-defendants alleged bad-faith denial of liability on fire policies. *Moskos*, 60 Ill. App. 3d at 131, 376 N.E.2d at 389. Defendants contended that plaintiff willfully and maliciously caused the fire in order to collect on the insurance policies and defraud the defendants. *Moskos*, 60 Ill. App. 3d at 131, 376 N.E.2d at 389. The trial court entered summary judgment in favor of defendants. *Moskos*, 60 Ill. App. 3d at 132-33, 376 N.E.2d at 390. In deciding the summary judgment motion, the trial court considered the results of a polygraph examination given to the plaintiff, which showed deception. *Moskos*, 60 Ill. App. 3d at 132, 376 N.E.2d at 390. We affirmed the trial court's order, ruling that the trial court properly considered the polygraph results because it helped establish that the defendants did not act in bad faith in believing the plaintiff committed arson. *Moskos*, 60 Ill. App. 3d at 134, 376 N.E.2d at 391.

*Moskos* is distinct from this case because in *Moskos*, the issue was decided on a motion for summary judgment. Thus, a jury was not involved in that case. Here, the case was tried before a jury. A jury is more apt to attribute too much weight to a polygraph examination's results and thus, abdicate its own role as assessor of credibility than a seasoned trial judge who understands the inherent unreliability of such examinations.

20

We believe that *Lynch v. Mid-America Fire & Marine Insurance Co.*, 94 Ill. App. 3d 21, 30, 418 N.E.2d 421, 429 (1981), provides a more appropriate comparison. In *Lynch*, the court affirmed the trial court's decision to exclude evidence of polygraph results in a jury trial in which plaintiff brought an action against his insurer for failure to pay a claim under its fire policy. *Lynch*, 94 Ill. App. 3d at 30, 418 N.E.2d at 429. The court reasoned that the polygraph "evidence would have been likely to have been improperly considered by the jury as to the arson policy defense despite any limiting instruction, [therefore] the trial court did not err in balancing the prejudice against the probative value and denying admission." *Lynch*, 94 Ill. App. 3d at 30, 418 N.E.2d at 429.

Likewise, the circuit court had a solid basis to believe that there was a substantial probability that the jury would have improperly considered the polygraph evidence in this case. As a result, the circuit court did not abuse its discretion in balancing the prejudice against the probative value and denying explicit reference to polygraph evidence.

CONCLUSION

For the foregoing reasons, we affirm the trial court's evidentiary rulings.

Affirmed.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

1-06-2837

_____

OMAR AGUIRRE, EDAR ZAVIER DUARTE SANTOS, and ROBERT GAYOL,

      Plaintiffs-Appellees,

v.

THE CITY OF CHICAGO, a Municipal Corporation; and CITY OF CHICAGO POLICE OFFICERS ROBERT RODRIGUEZ, CARLOS VELEZ, ALFONSO BAUTISTA, AL PEREZ, PAUL LOPEZ, and MICHAEL CHASEN,

      Defendants-Appellants,

_____

No. 1-06-2837

Appellate Court of Illinois
First District, Fifth Division

April 4, 2008

_____

JUSTICE GALLAGHER delivered the opinion of the court.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

_____

Appeal from the Circuit Court of Cook County.

Honorable Daniel Locallo, Judge Presiding.

_____

For APPELLANTS, Corporation Counsel of the City of Chicago, Chicago, IL (Mara S. Georges, Benna Ruth Solomon, Myriam Zreczny Kasper, and Christopher S. Norborg, of counsel)

For APPELLEES, Cochran, Cherry, Givens, Smith, & Montgomery, LLC, Chicago, IL (James D. Montgomery, James D. Montgomery, Jr., and Melvin L. Brooks, of counsel) and Michael W. Rathsack Law Office, Chicago, IL (Michael W. Rathsack, of counsel).