JUSTICE McCULLOUGH delivered the opinion of the court: The trial court adjudicated respondent, Jonathan C.B., a delinquent minor, finding him guilty of criminal sexual assault (720 ILCS 5/12 — 13(a)(1) (West 2004)) and attempt (robbery) (720 ILCS 5/8— 4(a), 18 — 1 (West 2004)), and ordered him to be committed to the Illinois Department of Juvenile Justice for an indeterminate term to automatically terminate upon the first of the passage of 15 years or respondent attaining the age of 21. Respondent appeals, arguing (1) the State failed to prove him guilty of criminal sexual assault beyond a reasonable doubt; (2) his due-process rights were violated when he was shackled during his bench trial; and (3) section 5 — 101(3) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5 — 101(3) (West 2004)), as applied to juveniles charged with sex offenses, is unconstitutional because it denies juveniles the right to a jury trial. We affirm. On August 24, 2006, the State filed a supplemental petition for adjudication of wardship, alleging respondent was a delinquent minor and charging him with criminal sexual assault (720 ILCS 5/12— 13(a)(1) (West 2004)) and attempt (robbery) (720 ILCS 5/8 — 4(a), 18 — 1 (West 2004)). On August 30, 2006, respondent’s bench trial began. At respondent’s trial, the State presented evidence that during the late evening on July 10, 2006, and the early morning on July 11, 2006, respondent, who was 16 years old, and another minor, G.W., sexually assaulted and attempted to rob 45-year-old C.H. Respondent’s theory of the case was that he and G.W. paid C.H. $40 for sex and then attempted to retrieve their money. C.H. testified that at approximately 11:30 p.m. on July 10, 2006, she left her home to make a phone call at her friend Donnie Stewart’s house. As she walked to Stewart’s house, she was approached by a tall boy and a shorter, younger boy. C.H. identified respondent as the taller boy. She stated the shorter boy commented to her “I have three for one.” She told him he should be home in bed and respondent told C.H. that the shorter boy was his brother and she was not to speak to him that way. C.H. testified the boys made her uncomfortable and she continued on her way. C.H. arrived at Stewart’s house and used his phone. She remained there approximately 10 minutes and then left to return home. As she was walking home, she heard footsteps behind her and saw respondent and a second boy. The second boy was not the same boy from the earlier encounter and C.H. described him as being short and stout. C.H. testified the boys called to her and respondent asked her if she wanted a drink. She stated he raised the garage door on a nearby duplex using a button and asked her to come toward the garage. C.H. declined and respondent let the garage door down. He then suggested they go have a drink at the back of the house. C.H. testified the shorter boy grabbed her arm and pulled her behind the house. She was pushed to her knees and felt respondent, who was behind her, put his penis in her vagina. The shorter boy placed his penis in C.H.’s mouth. C.H. stated she fought back to no avail and was screaming. During the attack, her bra and shirt were torn. C.H. testified she saw people across the street but no one helped her. A boy walked by and asked what was happening. C.H. stated the shorter boy became startled and let go of her. She was able to get away but slipped and fell. C.H. then saw her friend Keisha driving by and asked her for help. Keisha drove an orange or gold vehicle that was “maybe like a truck.” According to C.H., respondent told Keisha not to let C.H. in Keisha’s vehicle because the police were coming and Keisha did not let her in. Respondent presented testimony from Takesha Williams, who stated she drove an orange Pontiac Aztec, which she described as a “funny-made truck.” She was acquainted with C.H. but denied that C.H. approached her and asked for a ride on the date of the alleged offenses. Instead, Williams asserted she was at her home with her children. C.H. testified that, after being denied entiy into Keisha’s vehicle, she continued on and was able to get to a tree near the back of her house. At that point, respondent hit her on the back of her head and knocked her down. C.H. stated she always carried a pocketknife with her when she was out after dark and respondent yelled at her to “drop the knife.” Respondent also put his foot on her left arm and held it down. The other boy started stomping on C.H.’s head. C.H. testified she saw a light and heard a male voice say “let her go.” The male voice belonged to a police officer. C.H. testified an ambulance also arrived at the scene. She received medical care for injuries to her arm. C.H. also reported that her stomach hurt. She refused to go to the hospital. Further, C.H. acknowledged that she did not tell police she had been sexually assaulted but stated she did report the sexual assault to paramedics. Sarah Ramey, a paramedic employed by Arrow Carle Ambulance, testified that, in the early morning hours of July 11, 2006, she and her partner were dispatched to C.H.’s location. Ramey observed C.H., whom she described as hysterical, crying, and having trouble breathing. C.H. appeared to be intimidated by men on the scene and immediately reached for Ramey. C.H. stated she wanted to go home but agreed to go into the ambulance so Ramey could check her injuries. As Ramey helped C.H. to the ambulance, C.H. whispered to Ramey that C.H. “was raped.” Ramey testified she observed abrasions on both of C.H.’s elbows and a shoe print on her left arm. C.H. also had some tenderness in her abdomen. Ramey stated she pleaded with C.H. to go to the hospital but C.H. refused. Destiny Nesbitt testified she was respondent’s cousin and was with him on the evening of July 10, 2006. At about 10:45 p.m., respondent asked for $40 because there were some girls in the neighborhood and he needed money. Nesbitt gave respondent the money and then went to sleep at approximately 11 p.m. Shortly after 1 a.m., Nesbitt’s boyfriend spoke with respondent on the phone. During that conversation, respondent stated he had “hit a hype,” which she understood to mean he hit a drug addict. Ultimately, Nesbitt learned the police were looking for respondent. Nesbitt testified she lived in a duplex at 2701A Campbell Drive. A woman named Pooker lived on the other side of the duplex, 270IB, with her five children, including G.W The duplex had a garage, which Nesbitt also rented. She testified a key was required to get inside the garage and that it always stayed locked. On the night of the incident, Nesbitt learned respondent was inside Pooker’s residence and attempted to persuade him to leave the residence and talk with police. Sheriff’s deputy Andrew Good testified that, on July 10, 2006, he was working as a patrol officer on the midnight shift. Around 1:15 a.m. he heard screaming and observed two males standing over a female. The males were screaming at the female and appeared to be striking her with their fists or hands. Good heard the males saying “Give me the money,” and “Where is the bread.” The female asked the males to stop hitting her and stated she did not have any money. Good also heard her tell the males to “put the knife down.” Good testified he observed the female stand up and run in his direction with the two males chasing her. He drew his weapon, pointed his flashlight in their direction, identified himself as a sheriffs deputy, and ordered them to stop. The two males turned and ran in the opposite direction. Good observed that the female was wearing a tank top that was torn, exposing her bra strap. Her bra was also torn and her pants were soiled in the crotch area. Good described her as hysterical and stated it was hard to get information from her. At first, the female stated she had been raped and the two males had a gun. Good saw that her elbows and arms were scratched and her elbows were bleeding. Ultimately, the female was able to tell police where her attackers came from. She described a duplex with a large tree in the front yard. Police went to a residence at 2701 Campbell Drive but were unable to immediately make entry. They tried contacting people inside the residence and eventually someone opened the door and they were able to take custody of two suspects, G.W. and respondent. A showup identification was conducted. Good heard respondent state that he and G.W. “just went up to help her” but they “saw the police and *** ran.” Eventually, G.W. and respondent were arrested and transported to a detention center. Good described G.W. as being “five five” and weighing 160 pounds and respondent as being “five two” and weighing 115 pounds. Sheriffs deputy Norman Meeker testified that on July 10, 2006, he was working the 11 p.m. to 7 a.m. shift and was dispatched to the area of the incident in question to assist with a fight. Later, the nature of the dispatch changed and he was informed that it was an armed robbery. He was provided with descriptions of the suspects and the direction they were traveling. He began walking on Campbell Drive alongside houses. At 2701A Campbell, he heard someone talking on the phone, saying “they better have their [$40].” Meeker continued to watch the duplex and observed the front door on one side open and close approximately five times. Eventually, he made contact with Nesbitt from 2701A. She stated she was getting her cousin, whom she identified as respondent. Nesbitt stated she was supposed to be watching respondent and at about 1:15 a.m. she received a phone call from him and he stated “he just hit a hype.” She stated respondent was on the other side of the duplex. Nesbitt acknowledged she loaned respondent $40 earlier in the evening and he stated he no longer had it but would get it back for her. Meeker and other officers attempted to make contact with the people inside 2701B Campbell Drive by knocking and pounding on the door and announced that they were the sheriffs office. No one answered the knocking or pounding. Nesbitt was able to speak with somebody inside the residence by phone and Meeker asked her to have them open the door. Eventually, around 2:15 a.m., the door was opened. Two suspects were found in the residence, G.W. and respondent. A showup identification was conducted and Meeker heard respondent say something about how they “were just walking with [C.H.].” C.H. identified G.W and respondent and they were arrested. Meeker testified he later interviewed respondent. Respondent stated C.H. approached him earlier in the evening, wanting to sell a television. He replied that he did not have any money. They then discussed the possibility of C.H. doing something else for money. Respondent stated he had a friend and C.H. stated that was okay. Respondent called G.W and obtained $40 from his cousin. Respondent stated both he and G.W. had sexual relations with C.H. behind 2701 Campbell Drive. Specifically, he stated he had oral sex with C.H. and G.W had sexual intercourse with her. Respondent reported that, during the acts, C.H. fell over, cut herself, and her shirt and possibly her bra became torn. C.H. then became upset and asked respondent and G.W. to walk her home so her husband would not be mad. Respondent stated that, as they were walking, C.H. “freaked out” and began yelling and screaming. At one point, she also pulled out a box cutter. The police then arrived on the scene, and he and G.W ran away. Meeker testified respondent later changed his story. First, he asserted he never actually engaged in any sexual activity with C.H. because she fell over. Second, respondent informed Meeker that he and G.W began following C.H. as she left because they wanted to get their $40 back. He stated G.W hit C.H. and knocked her down in an attempt to get the money. At that time, the police arrived. Respondent asserted he never hit C.H. According to Meeker, respondent also reported that, while he and G.W were inside the residence at 2701B Campbell, they discussed what they were going to tell police about what happened. Curtis Apperson testified he was an investigator for the sheriff’s department and he and sheriff’s deputy William Davis interviewed C.H. Initially, the offense they were investigating was an armed robbery. However, during the interview, C.H. reported she had been raped and the nature of the investigation changed. Apperson stated C.H. was emotional when she disclosed the sexual assault. He and Davis collected the clothing she had been wearing during the offenses and took her to the hospital to obtain a rape kit. Apperson asked C.H. why she did not report the sexual assault earlier to police. She explained that she had been the victim of a rape before but police did not believe her. She felt her claims would not be investigated. C.H. did report to Apperson and Davis that she told a female paramedic or firefighter that she was raped. Apperson and Davis transported C.H. to the hospital, where they continued to interview her. Apperson stated C.H.’s emotions were up and down. At times, she was calm, but at other times she became very emotional and was crying and lowering her head. Apperson testified C.H. reported $50 was taken from her during the incident. He also stated she reported that, prior to being attacked, she had been to two places, Antoine’s house and Donnie’s house. However, Apperson stated it was difficult to talk to C.H. because of her emotions so he was “not exactly clear” where C.H. stated she had been prior to when the offenses allegedly occurred. Davis testified C.H. reported that she was at Antoine’s house before the incident in question and that she had a birthday drink. She did not mention anyone named Donnie Stewart to Davis. Also, he stated C.H. told him she was initially approached by three individuals rather than two. Mary Sexton testified she was a registered nurse and performed a sexual assault kit on C.H. C.H. reported to Sexton that she had been walking home from a friend’s house and the friend had not been home. She was raped by two young males and stated she had seen a small gun. Respondent testified he was 16 years old. On July 10 and 11, 2006, he was staying at the home of his cousin, Destiny Nesbitt. G.W lived next door to Nesbitt. Between midnight and 12:30 a.m. on July 11, 2006, C.H. approached respondent and G.W.’s little brother and asked them if they wanted to buy a television. Respondent replied that he did not. C.H. then asked respondent if he had any money or if he sold drugs. Respondent replied negatively to both questions. C.H. asked respondent if she could do anything for some money. Respondent understood that C.H. was referring to some type of sexual activity. He testified he called G.W and C.H. offered to have sex with both of them for $20 each. Respondent testified he borrowed $40 from Nesbitt. He gave G.W $20 and G.W. and C.H. went behind the duplex and engaged in sexual intercourse. After 5 or 10 minutes, G.W came out from behind the house and handed respondent a condom. Respondent then went behind the house and paid C.H. $20. C.H. performed oral sex on respondent and then the two engaged in vaginal sexual intercourse. Respondent testified that as he engaged in vaginal intercourse with C.H., he grabbed her shoulders and her bra strap tore. She also slipped and scraped her elbow. After slipping, C.H. got up and was crying. She asked respondent to walk her home because her boyfriend was going to beat her. Respondent agreed to walk her home and stated he did not get a chance to finish having sex with C.H. Respondent testified that, as he and G.W were walking C.H. home, they decided to get their money back from her. He stated, at that time, C.H. drew a knife and he told her to put it down. After C.H. put the knife away, G.W. shoved her and knocked her down. Respondent stepped on C.H.’s arm so that she would not go for her knife. G.W. searched C.H. but did not find any money. He asked her where her money was. Police appeared on the scene, flashed lights on them, and told them to stop. Respondent and G.W ran to G.W’s house and went inside. Police arrived at G.W.’s house 15 to 20 minutes later. Approximately five minutes later, G.W. opened the door and they were taken into custody. After hearing all the evidence and the parties’ arguments, the trial court found respondent guilty of both charged offenses and adjudicated him delinquent. On November 13, 2006, the court ordered him to be committed to the Illinois Department of Juvenile Justice for an indeterminate term to automatically terminate in 15 years or upon respondent attaining the age of 21, whichever came first. This appeal followed. On appeal, respondent first argues the State failed to prove him guilty of criminal sexual assault beyond a reasonable doubt. He maintains C.H. was not a credible witness and the trial court’s judgment as to her credibility was not reasonable in light of the record. “In reviewing the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” (Emphasis in original.) People v. Jordan, 218 Ill. 2d 255, 269, 843 N.E.2d 870, 879 (2006). A reviewing court’s function is not to retry the defendant and it should not substitute its judgment for that of the trier of fact. People v. Sutherland, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217 (2006). “The weight to be given the witnesses’ testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact.” Sutherland, 223 Ill. 2d at 242, 860 N.E.2d at 217. A conviction must be reversed “where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of [the] defendant’s guilt.” People v. Smith, 185 Ill. 2d 532, 542, 708 N.E.2d 365, 370 (1999). A person commits criminal sexual assault if he or she performs an act of sexual penetration by the use of force or threat of force. 720 ILCS 5/12 — 13(a)(1) (West 2004). Here, C.H. testified she was grabbed and taken behind a duplex where G.W. and respondent forced her to engage in sexual acts. She stated she was screaming and fought back but was overpowered. C.H. specifically testified respondent inserted his penis into her vagina. The record reflects C.H. reported being “raped” immediately to paramedic Sarah Ramey and sheriffs deputy Andrew Good. She was described by Ramey and police as being very emotional to the point of being hysterical. Also, the trial court commented that C.H. became similarly emotional when providing testimony on the subject of the sexual assault. Respondent points out C.H. provided inconsistent statements about where she went prior to the incident in question, how many boys she saw during an initial encounter, the opening and closing of the duplex’s garage door, an encounter with her friend “Keisha” during the attack, and whether the boys had a gun. Here, the trial court noted the case came down to issues of credibility and that inconsistencies were present in both C.H.’s testimony and respondent’s testimony. The court’s oral ruling in the case shows it thoroughly considered all of the evidence presented, including the inconsistencies in C.H.’s testimony. In the end, it found C.H. more credible than respondent. That finding is not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of respondent’s guilt. Although C.H.’s testimony contained inconsistencies, they did not concern the essential facts of the sexual assault or attempted robbery. Moreover, respondent’s own statements were inconsistent and evolved over time, reflecting negatively on his own credibility. He made several different statements, regarding the sexual acts he engaged in with C.H. After initially being taken into custody, police heard respondent state he was “just walking with [C.H.]” and that he was trying to help her. In his first statement to police, he stated he and C.H. engaged in oral sex but later changed his story and said they never engaged in any sexual acts. Finally, at trial, respondent testified he engaged in both oral and vaginal sex with C.H. As the trial court pointed out, at trial, respondent asserted he met C.H. between midnight and 12:30 a.m. on July 11, 2006, and thereafter obtained $40 from his cousin, Destiny Nesbitt, to pay C.H. for sexual acts she agreed to perform. However, Nesbitt testified she gave respondent $40 at approximately 10:45 p.m. on July 10, 2006, at least 1 hour and 15 minutes before respondent asserted he encountered C.H. Additionally, respondent’s version of the acts surrounding the attempted robbery was drastically different from the acts witnessed by sheriffs deputy Good. Respondent asserted G.W shoved and knocked C.H. down and he only stepped on C.H.’s arm so that she could not go for her knife. C.H. screamed for help twice, and G.W searched her and asked where the money was. At that point, police arrived on the scene and he and G.W. fled. Good testified, however, that he heard screaming and observed two males standing over a female. The males were screaming at the female and appeared to be striking her with their fists or hands. The female asked the males to stop hitting her and stated she did not have any money. The female then stood up and ran in Good’s direction with the two males chasing her. When Good made his presence known, the males ran in the opposite direction. Respondent essentially asks this court to reweigh the evidence, which is not the function of a reviewing court. The record shows the trial court thoroughly considered the evidence and made a well-reasoned determination as to credibility. The evidence was sufficient to find respondent guilty of criminal sexual assault. On appeal, respondent next argues the trial court violated his fourteenth amendment due-process guarantees by having him shackled without an individualized determination of necessity. In People v. Boose, 66 Ill. 2d 261, 265, 362 N.E.2d 303, 305 (1977), the supreme court held that the shackling of a defendant is disfavored because it (1) tends to prejudice the jury, (2) restricts the defendant’s ability to assist his counsel during trial, and (3) offends the dignity of the judicial process. Nevertheless, a defendant may be shackled where a manifest need for restraints is shown. Boose, 66 Ill. 2d at 265-66, 362 N.E.2d at 305. Specifically, “[a] defendant may be shackled when there is reason to believe that he may try to escape or that he may pose a threat to the safety of people in the courtroom or if it is necessary to maintain order during the trial.” Boose, 66 Ill. 2d at 266, 362 N.E.2d at 305. Whether to restrain the defendant is within the trial court’s discretion and its decision will not be reversed absent an abuse of that discretion. Boose, 66 Ill. 2d at 266-67, 362 N.E.2d at 305-06. The court must hold a hearing outside the presence of the jury, allowing the defendant’s attorney the opportunity to argue why the defendant should not be shackled. Boose, 66 Ill. 2d at 266, 362 N.E.2d at 305. If it orders the defendant to remain shackled, the court must also state the reasons for its decision on the record. Boose, 66 Ill. 2d at 266, 362 N.E.2d at 305. Boose applies to both bench and jury trials. People v. Strickland, 363 Ill. App. 3d 598, 603, 843 N.E.2d 897, 901 (2006). Here, only one small reference to respondent’s shackling was made in the record. When respondent was called to testify on his own behalf the trial court stated as follows: “Okay. You may step up. You may take off the shackles. Sir, you may go ahead and approach the bench. Raise your right hand.” Respondent was then sworn in and proceeded to testify. The record contains no further mention of respondent’s shackling and he made no objection, either during his trial or in a posttrial motion, to being shackled. A defendant who fails to object to shackling at trial or in a post-trial motion forfeits review of the issue on appeal. People v. Barney, 363 Ill. App. 3d 590, 593, 844 N.E.2d 80, 83 (2006). However, pursuant to the plain-error doctrine, a reviewing court may consider otherwise forfeited issues if the evidence was closely balanced or the error was of such magnitude that the defendant was denied a substantial right and a fair trial. Barney, 363 Ill. App. 3d at 593-94, 844 N.E.2d at 84. “[P]lain error does not automatically occur when shackles are used without a Boose hearing.” Barney, 363 Ill. App. 3d at 596, 844 N.E.2d at 86. Instead, “[wjithout objecting and preserving the issue for review, the defendant must show the evidence was closely balanced or ‘the error was so serious it affected the fairness of his trial and challenged the judicial process’s integrity.’ ” Barney, 363 Ill. App. 3d at 597-98, 844 N.E.2d at 87, quoting People v. Thompson, 359 Ill. App. 3d 947, 951, 835 N.E.2d 933, 936 (2005). In Strickland, 363 Ill. App. 3d at 602, 843 N.E.2d at 901, this court considered whether the defendant was denied a fair trial because the trial court ordered one of his hands to be handcuffed to a table during his jury trial. The defendant made no objection to the court’s order but argued the handcuffing resulted in plain error. Strickland, 363 Ill. App. 3d at 602, 843 N.E.2d at 901. We declined to reverse the defendant’s conviction under the plain-error doctrine. Strickland, 363 Ill. App. 3d at 604, 843 N.E.2d at 903. In part, we relied on People v. Hyche, 77 Ill. 2d 229, 240-41, 396 N.E.2d 6, 12 (1979), wherein the supreme court considered whether a defendant’s conviction warranted reversal when he appeared before a jury in handcuffs but failed to make an objection. There, the court concluded the defendant had waived any error by failing to object and affirmed the trial court’s judgment. Hyche, 77 Ill. 2d at 241, 396 N.E.2d at 12. In Strickland, 363 Ill. App. 3d at 604-05, 843 N.E.2d at 903, we noted the Hyche decision indicated it was “the State’s compelling the defendant to wear restraints before the jury that create [d] the constitutional violation.” We reasoned that “when a defendant fails to object to wearing restraints, the presence of compulsion is negated, and a constitutional violation has not been established.” Strickland, 363 Ill. App. 3d at 605, 843 N.E.2d at 903. Here, respondent made no objection to his shackling and the record does not indicate the trial court was even aware that he was shackled until he was called to testify. Pursuant to Strickland, reversal of respondent’s convictions is not warranted by the plain-error doctrine. Also, respondent failed to satisfy either prong of the plain-error doctrine. First, the evidence in his case was not closely balanced. Respondent was charged with criminal sexual assault and attempted robbery. Although the testimony regarding the criminal sexual assault came down to a credibility determination between respondent and C.H., the evidence presented as a whole was not so close as to warrant application of the plain-error doctrine. During his testimony, respondent essentially admitted his part in the attempted robbery, acknowledging that he and G.W. agreed to take money from C.H. and that he restrained C.H. while G.W searched her for money. He made similar admissions in his first statements to police. Further, as discussed, respondent’s version of the events surrounding the criminal-sexual-assault charge contained many inconsistencies. The dissent insists the evidence was closely balanced but only considers the evidence in connection with the criminal sexual assault. Respondent has also failed to show the error was so serious it affected the fairness of his trial and challenged the judicial process’s integrity. As stated, the record does not show the trial court was even aware that respondent was shackled until he was called to testify. If the court had not suggested the shackles be taken off, the record would show nothing as to this issue. The court ordered the shackles removed and the record does not reflect respondent had to continue wearing them after he testified. The record does not show the court was prejudiced by respondent’s shackles, they restricted his ability to assist his counsel, or the dignity of the judicial process was offended. Additionally, more than sufficient evidence of respondent’s guilt was presented at his trial. Finally, we note respondent argues “shackling a minor so offends the basic notions of justice that trial courts should have a sua sponte duty to intervene.” We find no authority for the position and respondent cites none. Also, again, the record fails to show the trial court was aware of the shackles prior to when respondent was called to testify and may not have been in a position to know it needed to intervene. On appeal, respondent last argues section 5 — 101(3) of the Act (705 ILCS 405/5 — 101(3) (West 2004)), as applied to juveniles charged with sex offenses, is unconstitutional because it denies juveniles the right to a trial by jury. Specifically, he argues section 5 — 101(3) of the Act violates article I, section 8, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §8) and his state and federal constitutional rights to due process and equal protection. “[A] 11 statutes are presumed constitutional and *** the party challenging a statute’s validity bears the burden of demonstrating a clear constitutional violation.” In re Lakisha M., 227 Ill. 2d 259, 263, 882 N.E.2d 570, 573 (2008). If reasonably possible, a court must construe a statute so as to affirm its constitutionality. Lakisha M., 227 Ill. 2d at 263, 882 N.E.2d at 573. “[R]eview of a statute’s constitutionality is de novo.” Lakisha M., 227 Ill. 2d at 263, 882 N.E.2d at 573. Section 5 — 101(3) of the Act (705 ILCS 405/5 — 101(3) (West 2004)) provides that “[m]inors shall not have the right to a jury trial unless specifically provided by” the Act. Respondent first argues section 5 — 101(3) is unconstitutional pursuant to article I, section 8, of the Illinois Constitution (Ill. Const. 1970, art. I, §8), which provides as follows: “In criminal prosecutions, the accused shall have the right *** to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed.” Respondent maintains juveniles are entitled to a jury trial under the Illinois Constitution because juveniles charged with sex offenses are subject to criminal prosecution, resulting in a “conviction” upon a finding of guilt. He relies on the supreme court’s statements in In re J.W., 204 Ill. 2d 50, 787 N.E.2d 747 (2003), equating the term “convicted” with “adjudicated.” Additionally, respondent notes a shift in purpose and policy of the Act from rehabilitation to protecting the public and holding juvenile offenders accountable. The supreme court has previously held that juveniles have no right to a jury trial under the Illinois Constitution. See In re Fucini, 44 Ill. 2d 305, 310, 255 N.E.2d 380, 382 (1970); In re Presley, 47 Ill. 2d 50, 55, 264 N.E.2d 177, 179 (1970). In In re G.O., 191 Ill. 2d 37, 43, 727 N.E.2d 1003, 1007 (2000), the court rejected arguments that the denial of a jury trial to a juvenile charged with first-degree murder violated equal protection or due process. We note, although respondent relies heavily on Justice Heiple’s dissenting opinion in that case, it is the G.O. majority’s opinion which is precedential. As asserted by the dissent, these cases do not address respondent’s specific arguments. However, they have been cited by the parties and the dissent in G.O., relied upon by respondent, and we note them here by way of background. To support his position in this case, respondent relies on In re A.G., 195 Ill. 2d 313, 746 N.E.2d 732 (2001). There, the supreme court held that “compliance with the [Supreme Court] Rule 604(d) certificate requirement [(210 Ill. 2d R. 604(d))] [was] required in juvenile proceedings.” A.G., 195 Ill. 2d at 322, 746 N.E.2d at 737-38. In reaching that decision, the court made several observations about the Act. It noted the Act had “been significantly amended” in 1999 and thereafter contained “a purpose and policy section which represented] a fundamental shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law.” A.G., 195 Ill. 2d at 317, 746 N.E.2d at 735. Importantly, however, the court acknowledged proceedings under the Act were “still not criminal in nature and [were] to be administered in a spirit of humane concern for, and to promote the welfare of, the minor.” A.G., 195 Ill. 2d at 317, 746 N.E.2d at 735. Respondent next relies upon J.W., 204 Ill. 2d 50, 787 N.E.2d 747, which he argues makes it “all but explicit that juveniles are subject to full criminal prosecutions in an adversarial system.” That case dealt with the constitutionality of requiring a juvenile to register as a sex offender for his natural life. J.W., 204 Ill. 2d at 62, 787 N.E.2d at 754. However, J.W. dealt specifically and only with the Sex Offender Registration Act (Registration Act), which defined a juvenile sex offender as follows: “ ‘ “Juvenile sex offender” means any person who is adjudicated a juvenile delinquent as the result of the commission of or attempt to commit a violation set forth in item (B), (C), or (C — 5) of this Section or a violation of any substantially similar federal, sister state, or foreign country law. For purposes of this Section, “convicted” shall have the same meaning as “adjudicated.” ’ 730 ILCS 150/2(A — 5) (West 2000).” J.W., 204 Ill. 2d at 63, 787 N.E.2d at 755. The supreme court’s holding in J.W. is limited to application of the Registration Act, which expressly stated, for purposes of the Registration Act, “convicted” and “adjudicated” had the same meaning. As the State points out, J.W. does not stand for the broader proposition that all juveniles charged with sex offenses are subject to criminal prosecutions within the meaning of article I, section 8, of the Illinois Constitution or that the term “convicted” always holds the same meaning as “adjudicated.” More recently, in People v. Taylor, 221 Ill. 2d 157, 182, 850 N.E.2d 134, 147 (2006), the supreme court determined juvenile adjudications should not be considered a conviction for purposes of the escape statute. In reaching that decision, the court reasserted that bench trials are “all that is constitutionally required in juvenile delinquency proceedings” because a juvenile proceeding is not considered a criminal prosecution. Taylor, 221 Ill. 2d at 168, 850 N.E.2d at 140. Additionally, it stated as follows: “The policy that seeks to hold juveniles accountable for their actions and to protect the public does not negate the concept that rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system and that there are still significant differences between the two, indicating that ‘the ideal of separate treatment of children is still worth pursuing.’ ” Taylor, 221 Ill. 2d at 170, 850 N.E.2d at 141, quoting McKeiver v. Pennsylvania, 403 U.S. 528, 546 n.6, 29 L. Ed. 2d 647, 661 n.6, 91 S. Ct. 1976, 1986 n.6 (1971). Although the 1999 amendments altered the policy and purpose behind the Act, rehabilitation of juvenile offenders remains an important consideration, more important than in criminal proceedings. Additionally, the holding in J.W. was specific to the statute before it and does not broadly stand for the proposition that a juvenile adjudication is the same as a criminal conviction. Respondent has failed to meet his burden of establishing a constitutional violation of article I, section 8, of the Illinois Constitution. Respondent next argues section 5 — 101(3) of the Act, as applied to juveniles charged with sex offenses, violates his due-process right to a trial under the state and federal constitutions, which he maintains “grant persons the right to a trial by jury when *** charged with a serious criminal offense.” See U.S. Const., art. III, §2; Ill. Const. 1970, art. I, §13. More specifically, he contends his due-process rights entitle him to a jury trial because (1) the purpose of the Act is now to protect the public instead of to rehabilitate the juvenile and (2) a juvenile could be indefinitely and involuntarily committed as a sexually violent person based on nothing more than proof of his original bench adjudication of delinquency. First, as stated, although a shift in purpose and policy of the Act did occur after the 1999 amendments, Taylor makes clear that rehabilitation remains an important purpose and policy behind the Act, more so than in the criminal justice system. We reject respondent’s contention that “the purpose of the Act is now to protect the public instead of rehabilitate the juvenile.” That may be one purpose of the Act but it is not the Act’s sole purpose. Second, respondent’s argument that an adjudication of delinquency satisfies the requirements of the Sexually Violent Persons Commitment Act (Commitment Act) (725 ILCS 207/1 through 99 (West 2004)), exposing a juvenile to indefinite and involuntary commitment, is also without merit. Three criteria must be alleged and established before a person may be committed as a sexually violent person under the Commitment Act: (1) the person must have been found delinquent for a sexually violent offense (725 ILCS 207/15(b)(l)(B) (West 2004)), (2) the person must suffer from a mental disorder (725 ILCS 207/15(b)(4) (West 2004)), and (3) the person must be dangerous to others because his or her mental disorder creates a substantial probability that he or she will engage in acts of sexual violence (725 ILCS 207/15(b)(5) (West 2004)). Respondent argues an adjudication of delinquency for a sexually violent offense is sufficient to establish all three elements under the Commitment Act. To support his position, respondent cites portions of the dissenting opinion in In re Detention of Samuelson, 189 Ill. 2d 548, 568, 727 N.E.2d 228, 239 (2000) (Heiple, J., dissenting) (“[T]he State’s expert in this case was able to diagnose [the] defendant as having a ‘mental disorder’ *** solely by virtue of [the] defendant’s having committed the acts which led to his criminal conviction and punishment” (emphasis omitted)). We find the dissenting opinion in Samuelson specific to the facts of that particular case. Also, it is not precedential. It remains that the Commitment Act requires three separate criteria to be established. Additionally, respondent has failed to allege facts showing he could be subject to commitment as a sexually violent person. His delinquency adjudication for a qualifying offense is insufficient, alone, to satisfy the Commitment Act’s requirements. Finally, on appeal, respondent argues juveniles charged with sex offenses have an equal-protection right, under the state and federal constitutions, to a trial by jury. See U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2. “Equal protection guarantees that similarly situated individuals will be treated in a similar fashion, unless the government can demonstrate an appropriate reason to treat them differently.” People v. Whitfield, 228 Ill. 2d 502, 512, 888 N.E.2d 1166, 1172 (2007). “In cases where fundamental rights are not at issue, we employ so-called rational basis scrutiny and consider whether the challenged classification bears a rational relationship to a legitimate governmental purpose.” Whitfield, 228 Ill. 2d at 512, 888 N.E.2d at 1172. Respondent argues juveniles charged with sex offenses are similarly situated to other juvenile offenders who are subject to extended juvenile jurisdiction (EJJ) and are accorded the right to a jury trial (705 ILCS 405/5 — 810(3) (West 2004)), as well as adult offenders charged with sex offenses. He maintains no rational basis exists for treating those similarly situated groups differently. We agree with the State and find respondent has failed to show he is similarly situated to juveniles subject to EJJ proceedings or adult offenders charged with sex offenses. Again, respondent supports his contention with the argument that the purpose and policy of the Act, as it relates to juvenile sex offenders, is the protection of society rather than rehabilitation of the juvenile offender. As already discussed, we reject this contention and find, while the policies and purposes of the Act changed after the 1999 amendments to include the protection of society and holding juvenile offenders accountable for their crimes, rehabilitation remains an important purpose and policy of the Act. Next, respondent argues he is similarly situated to juveniles subject to EJJ and adult sex offenders because a juvenile sex offender faces the possibility of future commitment as a sexually violent person pursuant to the Commitment Act. Juveniles subject to EJJ face sentencing as juveniles and, like adult criminal offenders, an adult criminal sentence that is “stayed on the condition that the offender not violate the provisions of the juvenile sentence.” 705 ILCS 405/5— 810(4) (West 2004). Here, respondent does not face the possibility of an adult criminal sentence and is therefore not similarly situated to juveniles subject to EJJ proceedings or adult offenders. Further, he has failed to show that he is or could be subject to commitment as a sexually violent person under the Commitment Act. As the State points out, “[c]ommitment under the [Commitment Act] can result only after a successful separate action by the State, requiring proof of additional elements not common to all sex offenders, whether juvenile or adult.” Respondent failed to meet his burden of proving section 5 — 101(3) of the Act violated his equal-protection rights. Here, the record shows the State presented sufficient evidence to prove respondent committed the offense of criminal sexual assault beyond a reasonable doubt and that his due-process rights were not violated when he was shackled during his bench trial. Additionally, respondent has failed to establish section 5 — 101(3) of the Act, as applied to juveniles charged with sex offenses, is unconstitutional. For the reasons stated, we affirm the trial court’s judgment. Affirmed. MYERSCOUGH, J., concurs.