ANTHONY PORTER, Plaintiff-Appellant, v. THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—06—1438

Opinion filed July 31, 2009.

856

O'MALLEY, P.J., concurring.
GORDON, JOSEPH, J., dissenting.

Michael W. Rathsack, of Chicago (James Montgomery, James Montgomery, Jr., and Michael W. Rathsack, of counsel), for appellant.

Mara S. Georges, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Christopher S. Norborg, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE CAHILL delivered the opinion of the court:

Anthony Porter filed a malicious prosecution complaint against the City of Chicago and several city police officers (collectively, defendants). The trial court entered a directed verdict for three of the officers. A jury returned a verdict for the City and Officers Charles Salvatore and Dennis Gray. The jury found, in response to special interrogatories, that Officers Salvatore and Gray had probable cause to prosecute Porter for the 1982 murders of Jerry Hillard and Marilyn Green and that the officers were not motivated by malice.

Porter raises four issues on appeal: (1) whether the trial court erred by excluding evidence of a subsequent third-party confession to the murders; (2) whether the trial court erred by allowing testimony about plaintiff's reputation as a juvenile and the details surrounding an unrelated criminal conviction; (3) whether the existence of probable cause, an absolute bar to a malicious prosecution action, is determined at the time of arrest or at the time of subscribing a criminal complaint; and (4) whether the trial court erred by refusing to instruct the jury that malice can be inferred from a lack of probable cause. After the parties filed their briefs but before oral argument, another division of this court decided *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 887 N.E.2d 656 (2008). Porter filed a motion to cite *Aguirre* as additional authority in support of his first contention on appeal: that the trial court erred by barring evidence of a subsequent third-party confession. We granted Porter's motion. Due to the retirement of a justice on the original panel, we held a second oral argument and gave the parties an opportunity to address the impact of *Aguirre* on this case.

We begin with our standard of review. The first two issues Porter raises on appeal call into question evidentiary rulings by the trial court. These are reviewed for an abuse of discretion. See *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515 (1991). Although Porter concedes this in his appellate brief, he later suggested at oral argument that we apply *de novo* review to the trial court's ruling to exclude evidence of the third-party confession. *De novo* review of evidentiary rulings is an "exception to the general rule of deference [and] applies in cases where 'a trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " *People v. Caffey*, 205 Ill. 2d 52, 89, 792 N.E.2d 1163 (2001), quoting *People v. Williams*, 188 Ill. 2d 365, 369, 721 N.E.2d 539 (1999). The exception does not apply here. The record

shows that the trial court excluded the evidence on relevancy grounds and not because the trial court misapplied a rule of law. The third issue Porter raises on appeal involves an important ruling and a question of law in *Aguirre* that impacts on this case: what is the relevant time frame for events that may be considered in deciding whether or not the police had probable cause to prosecute. We review the trial court's rulings on questions of law *de novo*. *Eychaner v. Gross*, 202 Ill. 2d 228, 252, 779 N.E.2d 1115 (2002). The final issue raised is the trial court's refusal to instruct the jury that malice can be inferred from a lack of probable cause. "While the threshold for permitting an instruction in a civil case is modest, the standard for reversing a judgment based on failure to permit an instruction is high." *Heastie v. Roberts*, 226 Ill. 2d 515, 543, 877 N.E.2d 1064 (2007). We will not reverse absent an abuse of discretion. *Heastie*, 226 Ill. 2d at 543.

■ The elements essential to a malicious prosecution claim are firmly established in Illinois: (1) the defendant brought a criminal proceeding against the plaintiff; (2) the proceeding terminated in a manner indicative of innocence; (3) the defendant lacked probable cause to bring the proceeding; (4) the defendant acted out of malice; and (5) injury. *Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238 (1996). Defendants do not dispute that they initiated a criminal proceeding against Porter that resulted in a conviction. The facts that led to that conviction are set out in *People v. Porter*, 111 Ill. 2d 386, 489 N.E.2d 1329 (1986). We recite the relevant facts in our supreme court opinion verbatim:

"On August 15, 1982, at approximately 1 a.m., Henry Williams and William Taylor went to Washington Park in Chicago. They climbed a fence to enter the pool area in the park and went swimming. At the same time, Jerry Hillard and his fiance, Marilyn Green, were sitting in the upper portion of bleachers located to the west of the pools. After swimming for a while Williams decided to get out of the water. As he was putting on his pants, [Porter] approached with a gun in his hand and asked Williams if he had any money. [Porter] put the gun up to Williams' forehead, took $2 from his pocket, and then left. Williams continued to get dressed and looked for Taylor, who was still in the pool. He then saw [Porter] up in the bleacher area within three or four feet of Jerry Hillard with a gun pointed at Hillard. Williams finished dressing, and as he jumped back over the fence he heard several shots.

Taylor had continued to swim after Williams left the pool. He got out of the water and as he was drying off he saw [Porter] up in the north end of the bleachers. [Porter] was standing less than two feet from Hillard with his arm extended and a gun in his hand. [Porter] shot Hillard. Hillard fell back, and [Porter] shot him again. [Porter]

then ran down the bleachers toward Taylor, passed within three feet of him, and left the pool area to the south. Taylor went up to where Hillard had fallen. He did not see Marilyn Green shot.

Shortly after 1 a.m., on August 15, 1982, Officer Anthony Liance, of the Chicago police department, responded to a call that a man had been shot in Washington Park. As he approached the pool area from the north he observed Marilyn Green running from the north end of the bleachers. She was holding her neck with her right hand and pointed to the south end of the bleachers with her left hand. Liance continued to approach the pools and saw a person whom he later identified in court as being [Porter], running south next to the bleachers. He stopped and frisked [Porter], but let him go because he did not find a weapon on him. After running past Officer Liance, Green staggered toward Officer B. Johnson and his partner. The two officers were issuing a motorist a traffic citation at the time. Johnson helped Green into a squad car and noticed that there was a hole in her neck. She was taken to a hospital where she died.

Officer Dennis T. Dwyer and his partner also responded to the call. As they approached the pools from the north, Williams walked out from the bleachers and told them that a man had been shot up in the bleachers. Dwyer observed Hillard on the top step of the bleachers lying on his back and bleeding from the head. Hillard was taken to a hospital where he underwent surgery and later died.

\*\*\*

Both Henry Williams and William Taylor were taken by the police from the pool area to a police station. Williams identified a photograph of [Porter] in a mug book. He testified that he had seen [Porter] in the neighborhood almost every day for a period of about a year and a half before Hillard and Green were shot. Taylor also identified a photograph of [Porter] in a mug book. He had seen [Porter] in the neighborhood once or twice a month for a period of two to three years prior to the shootings. Taylor testified that when he was at the police station on August 15, 1982, he told the police that he did not see [Porter] shoot Hillard because he was afraid for his life. He had seen [Porter] mug two old men and said that one of his friends had been jumped by [Porter]. Taylor was living with his 95-year-old great-grandmother and stated that since he had to leave her alone when he went to work, he feared for her safety. On August 18, 1982, Taylor viewed a lineup at a police station and again identified [Porter].

\*\*\*

[Porter] called three witnesses on his behalf. Eric Werner, a professional photographer, presented testimony regarding the

physical appearance of the pool area at Washington Park. Werner had photographed the area at the request of [Porter's] counsel. The pictures were taken more than one year after Marilyn Green and Jerry Hillard were shot.

Kenneth Doyle also testified for [Porter]. He stated that he was at [Porter's] mother's house during the evening of August 14, 1982, and sat on the back porch with [Porter] drinking until about 2 a.m. the next morning. At that time he went with [Porter] and a friend to a nearby playground where they talked and continued to drink until 9 a.m. On cross-examination Doyle admitted he had talked to two detectives on August 17, 1982, and told them that he was drinking with [Porter] until about 10:30 p.m. on August 14, 1982, and then spent the rest of the night at home with his mother. At trial Doyle explained that he lied to the police because he was afraid he was going to be 'locked up.'

Finally, [Porter] called Georgia Moody, the 'common law' wife of one of his brothers. She saw [Porter] at his mother's house during the evening of August 14, 1982, playing cards with her children along with Doyle. She testified that [Porter] and Doyle did not go out on the porch and were not, to her knowledge, drinking. According to her, [Porter] left the house at about 2:30 a.m. on August 15, 1982, with Doyle and a friend. The defense then rested." *Porter*, 111 Ill. 2d at 391-94.

A jury found Porter guilty of the murders of Jerry Hillard and Marilyn Green. *Porter*, 111 Ill. 2d at 390. Our supreme court affirmed Porter's convictions on direct appeal. *Porter*, 111 Ill. 2d at 391.

In 1998, the Northwestern University School of Law's Center on Wrongful Convictions began investigating Porter's conviction. Paul Ciolino, a private investigator for the Center, spoke with Inez Jackson, who was at Washington Park with Hillard and Green on the night they were killed. Although Jackson told police in 1982 that she had left the park before the murders took place, she now told Ciolino that she witnessed her estranged husband, Alstory Simon, shoot Hillard and Green. Shortly thereafter, Ciolino obtained a videotaped confession from Simon. As a result, the State dropped the charges against Porter and he was released from custody. Simon pled guilty to the murders and is now serving a prison sentence.

On March 9, 2000, Porter filed this malicious prosecution complaint against defendants. Porter's theory was that the police targeted him as the shooter without probable cause to do so and coerced witness cooperation to obtain a conviction. Porter sought to introduce evidence of Simon's guilt in his case-in-chief.

We note here that Porter's brief contains several references to Simon's confession. But the confession itself was never produced in the

trial court. The record shows that Porter sought to introduce evidence of Simon's guilt through the deposition testimony of Inez Jackson.

In that deposition, taken August 16, 2000, Jackson said she went with Simon, Hillard and Green to Washington Park on the night of the murders. They sat in the bleachers drinking alcohol. At some point Simon and Hillard began arguing over money Hillard owed Simon. Jackson said the fight escalated, she saw Simon stand up and then she heard gunshots. Although Jackson did not say she saw Simon shoot Hillard or Green, she did say she saw a gun in Simon's hand. Jackson testified Simon then grabbed her hand, told her to be quiet and led her down the bleachers and away from the park. Two detectives came to Jackson's apartment the following day. Although Simon was at the apartment also, the police directed most of their questions to Jackson. Jackson told the police that she and Simon left Hillard and Green at the park because Hillard and Green were arguing. The police displayed four photographs and asked Jackson whether she could identify one of the photographs as a person she had seen at the park that night. Jackson said she could not. The police then singled out the photograph of Porter and told Jackson not to worry because they knew who had committed the murders. Jackson said she concealed her knowledge of the shooting from the police because she was afraid of Simon.

Defendants moved *in limine* to strike all references to Simon's guilt from Jackson's deposition testimony and to bar Porter from introducing other evidence to show that Simon committed the murders. Porter responded by arguing that Simon's guilt was relevant to whether the criminal proceedings were terminated in a manner indicative of his innocence. Defendants replied that they had already conceded that element of Porter's cause of action and, in so doing, withdrew the element from contention and so dispensed with the need for proof. The trial court ruled it would instruct the jury to make findings on the remaining elements of Porter's cause of action and that Porter need not prove that the criminal proceedings against him were terminated in a manner indicative of innocence.

Porter alternatively argued that Jackson's deposition testimony was probative of malice. Porter maintained Jackson's testimony would have shown that the police were "so blinded" by their "predetermination" of Porter's guilt that they failed to perform a "thorough" investigation. The trial court expressed doubt over whether the thoroughness of the investigation could be considered to find that the police were motivated by malice. But the court left the door open for Porter to explore this theory through the testimony of the police and the witnesses they interviewed.

The trial court then granted defendants' motion *in limine* and struck all references to Simon's guilt from Jackson's deposition. The court explained that Simon's guilt was not relevant to Porter's malicious prosecution claim because there was no evidence from which to infer that the police had reason to suspect Simon of the crime while they were investigating Porter. The following evidence was presented at the malicious prosecution trial.

William Taylor, who testified for the State at Porter's criminal trial, testified on behalf of Porter in this case. Taylor recanted his earlier testimony that he saw Porter shoot Hillard and Green. Taylor now said that he did not see the shooting because it was too dark. Taylor testified he told the police this but they were already convinced that Porter was the shooter and told Taylor it was in his best interests to "go with the flow." Taylor testified he spent 18 hours in an interview room at the police station and that Detective Salvatore used coercive interrogation methods to obtain his cooperation. Taylor also testified he was given a script to prepare his testimony for Porter's criminal trial. Taylor said Salvatore brought him to the trial and that when Taylor tried to leave, he was picked up by another officer and escorted back to the courthouse. Taylor said this was why he testified untruthfully at Porter's criminal trial.

Porter also called three other witnesses who were at Washington Park at the time of the shootings: Sheffield Younger, Michael Woodfork and Kenneth Edwards. These witnesses did not testify at the criminal trial.

Younger testified he was with Henry Williams at Washington Park on the night in question. Younger said he did not see Porter hold a gun to Williams' head or take $2 out of Williams' pocket. Younger also denied that he and Williams went swimming that night. Younger testified he was with Williams when the shooting occurred and heard gunfire but did not see the shooter because it was too dark.

Woodfork testified he was interviewed by the police on August 15, 1982. Woodfork said the police pointed to a photograph of Porter and asked Woodfork for an identification. Woodfork said he told the police he did not see Porter at Washington Park that night. Woodfork denied making the statement attributed to him in a police report that he saw the shooter.

Edwards, who was serving a prison sentence on an unrelated murder conviction, testified by videotape. He said he saw Porter at Washington Park on the night in question and heard gunfire but did not see who fired the gun because it was too dark. Edwards denied making statements attributed to him in a police report that he heard a shot, saw a flash and saw Porter take two more shots. Edwards also

recanted grand jury testimony given in 1999 that implicated Porter in the murders. Edwards said he testified falsely against Porter in 1999 in exchange for leniency on other pending criminal charges.

Henry Williams, whose testimony at the criminal trial helped convict Porter, died before the trial in this malicious prosecution action. Defendants introduced into evidence the statements Williams made to police following the shooting and his testimony at Porter's criminal trial to support their position that the police had probable cause to believe Porter shot Hillard and Green. Defendant police officers also testified about the events leading to Porter's arrest. The testimony showed that the police began investigating Porter based on statements made to them by Williams and Taylor following the murders. The officers denied targeting Porter without probable cause to do so. They also denied coercing witness cooperation.

At the conclusion of trial, the trial court directed a verdict for Officers Geraldine Perry, Anthony Liace and Dennis Dwyer. The trial judge did not state on the record why he did not direct a verdict for the City and Officers Charles Salvatore and Dennis Gray. We must presume the trial judge found sufficient evidence on each of the elements of Porter's malicious prosecution claim to submit the issue of liability with respect to these defendants to the jury. See *Heastie*, 226 Ill. 2d at 544 (a verdict should be directed in jury cases only where the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could ever stand); see also *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958 (1984) (in the absence of an adequate record, courts of review will presume that the trial court acted in conformity with the law and that its decision was supported by the facts of the case). We do know that the jury was given special interrogatories in addition to general verdict forms. Those interrogatories directed the jury to answer: (1) whether Salvatore and Gray had probable cause to charge Porter with the murders; and (2) whether they acted with malice. The jury returned a verdict for the City, Salvatore and Gray, finding they had probable cause to charge Porter with the murders and they did not act with malice.

■ Porter's primary contention on appeal is that the trial court erred by barring evidence of Simon's guilt. The trial court held the evidence was not relevant to the elements of malicious prosecution. See *In re A.W.*, 231 Ill. 2d 241, 256, 897 N.E.2d 733 (2008) ("[a]ll evidence must be relevant to be admissible"). We can infer from the record that the trial judge also found that evidence of Simon's guilt would have confused the issues properly before the jury. See *Gill v. Foster*, 157 Ill. 2d 304, 313, 626 N.E.2d 190 (1993) ("[e]ven relevant

evidence may be excluded if its probative value is substantially outweighed by such factors as prejudice, confusion, or potential to mislead the jury'').

Porter argues on appeal that evidence of Simon's guilt was relevant to whether the criminal proceedings against him were terminated in a manner indicative of his innocence. See *A.W.*, 231 Ill. 2d at 256 (''[e]vidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable''). Defendants respond that their concession on this element removed the fact from contention.

Ordinarily, a judicial admission of the sort made by defendants here ''has the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of that fact.'' *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 462, 605 N.E.2d 493 (1992). But a judicial admission does not automatically foreclose the introduction of evidence on the issue admitted. *Lee*, 152 Ill. 2d at 462. ''After all, 'a colorless admission by the opponent may sometimes have the effect of depriving the party of the legitimate moral force of his evidence \*\*\*.' '' (Emphasis omitted.) *Lee*, 152 Ill. 2d at 462, quoting 9 J. Wigmore, Evidence §2591, at 824 (Chadbourn rev. ed. 1981). Whether evidence should be admitted on a conceded fact is subject to the trial judge's discretion. *Lee*, 152 Ill. 2d at 462-63.

In this case, the jury was instructed: ''Each defendant has admitted that the criminal proceeding terminated in [Porter's] favor in a manner indicative of [Porter's] innocence and that [Porter] need not prove this proposition.'' Despite this instruction, the trial court allowed Porter to publish to the jury the pardon he received from former Governor George Ryan. Porter was also allowed to tell the jury that the pardon was based on a finding of innocence. Given this context for jury deliberation, we cannot say the trial judge abused his discretion by barring evidence of Simon's guilt.

We now address the impact of *Aguirre* on this case. The appellate court there affirmed a ruling that allowed a third-party confessor to testify on behalf of three malicious prosecution plaintiffs because the testimony supported the plaintiffs' theory of malice. Porter urges us to apply that ruling here to find that evidence of Simon's guilt should have been admitted to support his theory of malice.

The plaintiffs in *Aguirre* were convicted of murder based, in large part, on confessions obtained by the police. *Aguirre*, 382 Ill. App. 3d at 95. While the plaintiffs were serving their respective prison sentences, a person who was not a suspect in the original investigation confessed to the same murder. *Aguirre*, 382 Ill. App. 3d at 95. The State dismissed the charges against the plaintiffs and they were released from prison. *Aguirre*, 382 Ill. App. 3d at 96.

The *Aguirre* plaintiffs later filed a malicious prosecution action against the city and the police officers who performed the investigation. *Aguirre*, 382 Ill. App. 3d at 90. The plaintiffs set about to prove that the police coerced them into making the false confessions that led to their convictions. *Aguirre*, 382 Ill. App. 3d at 97. They introduced evidence showing that they were placed in separate interrogation rooms and were not allowed to speak with one another during the investigation. *Aguirre*, 382 Ill. App. 3d at 97-98. The plaintiffs were also allowed to call the confessed murderer to testify about the actual circumstances of the crime. *Aguirre*, 382 Ill. App. 3d at 97. The testimony showed that the murder did not happen in the manner described by the plaintiffs in their confessions, giving credence to the plaintiffs' theory that those confessions were orchestrated entirely by the police. *Aguirre*, 382 Ill. App. 3d at 97. The jury returned a verdict for the plaintiffs and the defendants appealed, arguing the trial court abused its discretion by admitting the testimony of the confessed murderer. *Aguirre*, 382 Ill. App. 3d at 96.

The appellate court found that the confessor's testimony was probative of malice (but not probable cause) because it supported the plaintiffs' position that their confessions were illegally obtained through coercive interrogation methods and were false. *Aguirre*, 382 Ill. App. 3d at 98-100. The court explained:

> "Plaintiffs sought to admit [the confessor's] testimony to demonstrate that [plaintiffs'] statements were false. During the trial, plaintiffs also introduced evidence that they did not speak to each other during the interrogation process. Yet their confessions were remarkably similar. Thus, plaintiffs believed that the jury could infer that the only way each plaintiff's confession was so similar was if the police told each plaintiff what to say. This inference would help establish malice." *Aguirre*, 382 Ill. App. 3d at 98-99.

The court rejected the defendants' argument that the testimony allowed for too many inferences, saying: "This is not a case where a contrary fact can be inferred with equal probability or where the chain of inferences becomes so tenuous that their probative value becomes nonexistent." *Aguirre*, 382 Ill. App. 3d at 100. The court also rejected the defendants' argument that the prejudicial impact of the testimony would outweigh its probative value:

> "Whatever prejudice [the confessor's] testimony had on the jury was mitigated by the circuit court's instruction to the jury that any events that took place after [the plaintiffs were charged] were irrelevant to the probable cause determination. *** [T]he circuit court instructed the jury that when determining probable cause, it should only consider what the officers knew [before charging the

plaintiffs]. Nothing in the record suggests that the jury failed to follow this instruction." *Aguirre*, 382 Ill. App. 3d at 100.

The court concluded there was no abuse of discretion in allowing the confessor to testify. *Aguirre*, 382 Ill. App. 3d at 101.

We note that *Aguirre* did not hold that the confessor's testimony was relevant to the issue of probable cause. To the contrary, the court held that the testimony could not have been used to show that the police there lacked the probable cause to charge the plaintiffs. *Aguirre*, 382 Ill. App. 3d at 100; see also *Smith v. Lamz*, 321 F.3d 680, 686 (7th Cir. 2003) (subsequent recantation made in an unsworn interview with a private investigator cannot be introduced to show police did not have probable cause based on original statement); *Gibson v. State*, 99—C—1730 (La. 4/11/00) p.6, 758 So. 2d 782, 795 (trial court's reliance on a subsequent third-party confession to show that the police lacked probable cause to initiate criminal proceedings was "manifestly erroneous"). In fact, the jury in *Aguirre* was instructed that all events occurring after the plaintiffs were formally charged, including the third-party confession, were irrelevant to the probable cause determination. *Aguirre*, 382 Ill. App. 3d at 100. The jury in *Aguirre* found a lack of probable cause based on other evidence.

The jury here, on the other hand, found that defendants had probable cause to charge Porter with the murders of Hillard and Green. Porter has never argued that this finding would have been different had the trial court admitted evidence of Simon's guilt. We point this out because probable cause is an absolute defense to malicious prosecution. See *Turner v. City of Chicago*, 91 Ill. App. 3d 931, 934-35, 415 N.E.2d 481 (1980); see also *Swick*, 169 Ill. 2d at 512 (absence of any one element defeats malicious prosecution claim). Even if Porter is correct and the trial court erred in excluding evidence of Simon's guilt, that error would not give rise to the relief Porter requests: a new trial. "While we would like all trials to be conducted error free, no useful purpose would be served by granting a new trial when the record reveals that the errors did not change the result reached by the jury." *J.L. Simmons Co. v. Firestone Tire & Rubber Co.*, 108 Ill. 2d 106, 115, 483 N.E.2d 273 (1985). The parties have not addressed this facet of the case and we believe it would be unfair to dispose of the appeal on grounds not argued. For this reason, we address whether evidence of Simon's guilt should have been admitted to show that defendants acted out of malice.

Porter argued in the trial court that Inez Jackson's deposition testimony would have "crystalized" his theory that defendants' baseless belief in his guilt was so strong that it corrupted their investigation. We can agree that the deposition testimony supports an inference

that the police had targeted Porter before they interviewed Jackson. Jackson testified the police held out a photograph of Porter and told Jackson not to worry because they already knew who committed the murders. But Porter has not shown how the fact of Simon's guilt supports his theory that the police acted out of malice by targeting him. The only way to link Simon's guilt to Porter's theory of malice is with evidence that the police had reason to suspect Simon of the crime but only investigated Porter. There was no such evidence. The only person who knew of Simon's involvement was Jackson and she purposefully withheld her knowledge from the police. Unlike the evidence of coerced confessions in *Aguirre*, there is no link between Simon's guilt and Porter's theory that the police investigation was corrupt.

To argue Jackson's deposition provides that link is to suggest that recanted testimony or other later-discovered evidence can form the predicate for finding a lack of probable cause for the original arrest. While there is case law that suggests recanted testimony or later-discovered evidence can relate back to establish no probable cause, those cases address allegations of coerced confessions, like *Aguirre*, where the recanted testimony is more reliable than the confessions. See generally *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 660, 858 N.E.2d 569 (2006); *In re Extradition of Contreras*, 800 F. Supp. 1462, 1469 (S.D. Tex. 1992).

With respect to the reliability of Simon's "guilt" and confession, we may take judicial notice that Simon has since recanted his confession. See *People v. Simon*, No. 1—01—4430 (2004) (unpublished order under Supreme Court Rule 23) (*Simon I*); *People v. Simon*, No. 1—06—3192 (2008) (unpublished order under Supreme Court Rule 23) (*Simon II*); see also *May Department Stores Co. v. Teamsters Union Local No. 743*, 64 Ill. 2d 153, 159, 355 N.E.2d 7 (1976) (court may take judicial notice of written decisions filed in other cases).

Simon pled guilty to the double homicide in 1999 and was sentenced to 37 years in prison. *Simon I*, slip op. at 1. Two years later, Simon filed a postconviction petition that challenged his plea. *Simon I*, slip op. at 1. Simon argued his guilty plea was coerced by promises made to him by Paul Ciolino. *Simon I*, slip op. at 4. Simon alleged Ciolino promised him money from movie and book deals that would come from Porter's exoneration and that former Northwestern University School of Law professor David Protess would " 'pull the necessary strings' " to get Simon released from prison. *Simon I*, slip op. at 4. Simon also argued the factual basis for his plea was unreliable and contradicted witness accounts given at Porter's criminal trial. *Simon I*, slip op. at 4-5. Simon did not prevail on his postconviction claim. *Simon I*, slip op. at 10 (affirming the dismissal of Simon's postconviction petition).

Simon filed a second postconviction petition in 2005, alleging actual innocence based on newly discovered evidence. *Simon II*, slip op. at 3. In support, Simon attached an affidavit wherein he recants his confession. *Simon II*, slip op. at 5. He also attached an affidavit by Inez Jackson, who said she implicated Simon in the double murder after receiving false promises from Ciolino. *Simon II*, slip op. at 5-6. This court held the evidence was not newly discovered and affirmed the dismissal of Simon's second postconviction petition. *Simon II*, slip op. at 6, 9.

We now turn to the three remaining issues raised on appeal.

■ Porter argues the trial court erred in admitting evidence that the police knew of an outstanding warrant for Porter's arrest while they were investigating him for the murders of Hillard and Green. The evidence was properly admitted as probative of whether the police had probable cause to charge Porter. See *People v. Fair*, 159 Ill. 2d 51, 69, 636 N.E.2d 455 (1994) (past criminal history of violence is relevant to probable cause); *People v. Hendricks*, 253 Ill. App. 3d 79, 88-89, 625 N.E.2d 304 (1993) (information that the defendant committed a similar offense is relevant to probable cause). Any prejudice to Porter was mitigated by his decision to present the evidence to the jury himself. See *People v. Spates*, 77 Ill. 2d 193, 395 N.E.2d 563 (1979) (a party who is denied his motion to exclude evidence may himself raise the matter at trial so as to lessen its prejudicial impact on the jury). The same is true for evidence admitted to show that police knew of Porter's reputation as a "bad guy."

■ Porter next argues defendants improperly tried to introduce evidence that he had three children by different women whose names he did not know. Porter objected to the line of questioning and the trial court sustained his objection. Assuming the evidence was improper, the error was corrected by the trial court's ruling. See *People v. Hall*, 194 Ill. 2d 305, 342, 743 N.E.2d 521 (2000) ("[g]enerally, if a timely objection is made at trial to improper interrogation, the court can, by sustaining the objection or instructing the jury to disregard the question and answer, usually correct the error"). We note that Porter did not move to strike testimony that had already been admitted on this issue. See *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 374, 553 N.E.2d 291 (1990) (failure to object or move to strike improper evidence waives ability to object for the first time in a post-trial motion or to claim the error was prejudicial).

■ Porter next asks this court to set the relevant time for determining probable cause in a malicious prosecution action as the point where the accused is arrested. Probable cause in this context has historically been determined by looking to what the defendants knew

at the time of subscribing a criminal complaint. See, *e.g., Turner*, 91 Ill. App. 3d at 935 (and cases cited therein). Given Illinois case law, we are not persuaded by Porter's argument for assessing probable cause at the earlier time of arrest.

■ Porter finally argues that the trial court committed reversible error by refusing to instruct the jury that malice could be inferred from a lack of probable cause. Even assuming the trial court erred, the error would have been harmless since the jury found by way of special interrogatory that defendants had probable cause. See *Turner*, 91 Ill. App. 3d at 937 ("malice may not be inferred where probable cause exists"); see also *Duffy v. Cortesi*, 2 Ill. 2d 511, 515-16, 119 N.E.2d 241 (1954) ("instructions will be considered as a whole, and where the jury has not been misled, and the complaining party's rights have not been prejudiced by minor irregularities, such errors will not be deemed grounds for reversal").

The judgment of the circuit court is affirmed.

Affirmed.

PRESIDING JUSTICE O'MALLEY, concurring:

I concur with the majority and write only to emphasize one point. This case turns simply on the question of whether or not the trial judge abused his discretion in barring the evidence of a confession given by a man named Simon, approximately 17 years after the occurrence and recanted several years after that. The latter fact was unknown to the trial judge at the time of his ruling. Whether the judge abused his discretion hinges in turn on whether any reasonable person could have reached the conclusion this judge did. The answer in my view is a resounding "yes." See *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 176-77 (2003) (holding that it is well settled that an abuse of discretion will be found where no reasonable person would take the view adopted by the trial court); *People v. Jenkins*, 383 Ill. App. 3d 978, 989 (2008) (holding that a trial court abuses its discretion when its ruling is "arbitrary, fanciful, or unreasonable[,] or when no reasonable person would take the same view").

It has long been acknowledged that the trial court is in the best position to make decisions regarding the admission of evidence on any given case. *People v. Slater*, 228 Ill. 2d 137, 151 (2008); *People v. Cookson*, 215 Ill. 2d 194, 213 (2005); *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1042 (2008). Further, it is not the prerogative of the appellate court to reweigh the evidence and substitute its judgment for that of the trial court even if that judgment would be different. *In re C.B.*, 386 Ill. App. 3d 735, 744 (2008) (finding that it is not the function of a

reviewing court to reweigh the evidence previously and properly considered by circuit court). The dissent contends that the 1999 confession should have been admitted because it is relevant to the issue of whether the arresting officers acted with malice in 1982. Although I believe this conclusion relies on a good deal of speculation, even assuming the confession was relevant, that is hardly the end of our inquiry. The remaining and perhaps more important question is whether the evidence is more prejudicial than probative, and again in my view, the answer is another resounding "yes." I agree with this very experienced trial judge that the probative value of a confession given 17 years after the fact would do little to illuminate the issue of malice; instead, the jury would almost certainly infer that these officers somehow knew someone else committed the crime but were deliberately framing defendant no matter what instructions were given. Related to that, in my view, it is only common sense to take judicial notice of Simon's later recantation in spite of the fact that the dissent gives the recantation short shrift. The recantation casts serious doubt on the likelihood that the officers knew defendant was not the perpetrator but were nonetheless maliciously framing him, not to mention on the questionable validity of the Governor's pardon predicated upon Simon's now-recanted confession.

In any event, the trial judge is in a unique position to evaluate the effect of this evidence on this particular jury given his opportunity to observe their competence and demeanor at *voir dire*. The appellate court, working from a cold record, lacks this insight, so these decisions have long been the province of the trial court. *Slater*, 228 Ill. 2d at 151, citing *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). In my view, this court made the correct decision.

For the foregoing reasons, I concur.

JUSTICE JOSEPH GORDON, dissenting:

I cannot concur with the analysis of the majority because it begs the key question upon which this decision pivots, namely, the relevance of Alstory Simon's confession which was excluded by the trial court.

The majority contends that because Simon confessed long after the plaintiff's arrest and criminal conviction, his confession would have no relevance in the plaintiff's malicious prosecution trial, since the defendants in such a trial must be judged on the basis of what was known to them at the time of the plaintiff's criminal arrest and prosecution. The majority is invested in the point with which I fully agree that proof of actual innocence is not a required element in the prosecution for the tort of malicious prosecution. Nor, in this case, is it needed to establish the element of favorable outcome since the State

stipulated to that fact. Note, however, that the State stipulated only that the criminal proceedings against the plaintiff were "terminated in a manner indicative of his innocence," but that it did not stipulate as to the plaintiff's actual innocence. Nevertheless, I fully concur that this stipulation would suffice if its admittance was to establish the element of favorable outcome, so as to obviate the need for any additional evidence.

However, the majority refuses to acknowledge that under the facts of this case proof of actual innocence would be highly relevant to help prove the absence of probable cause as well as the presence of malice. In this regard, the majority recognizes that there was no stipulation as to actual innocence and that the Simon confession would, if introduced at trial, be instrumental in proving actual innocence. The majority posits that the Simon confession, which came 16 years after the plaintiff was tried and convicted, has no material relevancy since it did not exist as of the time of the plaintiff's arrest and criminal trial, and that probable cause must be determined by the information available to the police at the time of the arrest and criminal trial. I submit, however, that these reasons overlook the specific facts of this case and the thrust of the reasoning which *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89 (2008), brings to bear upon them.

There is no dispute that the confession and conviction of a third party for the crime charged against the plaintiff is substantial proof of the plaintiff's actual innocence. Correspondingly, I do not challenge the principle that proof of actual innocence is not required to establish the elements of a malicious prosecution action, including the element of a favorable outcome. Nor would a confession and conviction of a third party 16 years after the fact in and of itself meaningfully evidence that the police were aware of that third party's confession or that they otherwise acted with sufficient information at the time they acted against the plaintiff, so as to lack probable cause to warrant the plaintiff's arrest or prosecution.

On the other hand, as pointed out in *Aguirre*, proof that the plaintiff did not in fact commit the crime is highly probative of the fact that a confession obtained from the plaintiff at the time of his arrest was false since he could not have committed the crime to which the third party confessed. Likewise, in this case, proof of the actual innocence of the plaintiff would effectively establish that the testimony of the alleged eyewitnesses who claimed to have seen the plaintiff commit the crime was false. Why then would the falsity of a confession or, as in this case, the falsity of the testimony of eyewitnesses be material since actual innocence is not a required element of proof? The answer is very clear, because the actual falsity of testimony would

lend substantially greater credence to the subsequent claim by these witnesses upon their recantation that the original false testimony was induced by police coercion or unlawful enticement.

The case of *Aguirre*, 382 Ill. App. 3d 89, fully reflects the significance of the aforementioned considerations. In *Aguirre*, the plaintiffs filed a complaint against the defendants alleging malicious prosecution. *Aguirre*, 382 Ill. App. 3d at 90. Following a jury trial, the jury returned a verdict for the plaintiffs finding that the defendants lacked probable cause and acted with malice when they prosecuted the plaintiffs. *Aguirre*, 382 Ill. App. 3d at 90. Defendants appealed alleging, *inter alia*, that the circuit court abused its discretion in admitting the testimony of the confessed murder describing the crime. *Aguirre*, 382 Ill. App. 3d at 90. The defendants specifically asserted that the evidence was irrelevant to whether they had probable cause to prosecute plaintiffs, that the testimony lacked probative value, and that even if it had probative value that value was outweighed by the prejudice done by its introduction. *Aguirre*, 382 Ill. App. 3d at 96. The appellate court disagreed with the defendants and affirmed the decision of the circuit court to admit the true murderer's confession as evidence in the malicious prosecution trial. *Aguirre*, 382 Ill. App. 3d at 98. In doing so, the appellate court found that the confession was relevant to establishing both that the plaintiffs received a favorable termination of the proceedings and that the defendants had acted with malice. *Aguirre*, 382 Ill. App. 3d at 98. With respect to malice, the appellate court found that the confession of the actual murderer was relevant because the plaintiffs attempted to use it in order to establish that their initial confessions to the police were false. *Aguirre*, 382 Ill. App. 3d at 98-99. The court noted:

"Perez [the confessed killer] testified that he committed the crime and testified to intricate details only the killer would know. Therefore, the jury could accept that Perez committed the crime by accepting his testimony; there is no need for the jury to draw an inference. If Perez committed the crimes then plaintiffs could not have committed them. This is the only logical conclusion that follows from Perez's admission. Likewise, the only logical and reasonable conclusion from Perez's testimony is that plaintiffs' confessions were false; if they were true, then Perez could not have committed the murder." *Aguirre*, 382 Ill. App. 3d at 99.

The appellate court further explained that Perez's testimony also worked in concert with other evidence that the plaintiffs had presented at trial to allow the jury to infer malice, namely, evidence that showed that while their version of events regarding the murder was substantially similar, they were held in detention and could not have com-

municated with each other before the State filed charges. *Aguirre*, 382 Ill. App. 3d at 99. As such, the court concluded that together with Perez's confession, an inference could be made that the police officers "suggested facts and answers and, in essence, created the false statements made by plaintiffs." *Aguirre*, 382 Ill. App. 3d at 99.

In coming to this conclusion, the appellate court rejected the defendants' argument that the introduction of the evidence was prejudicial because it confused for the jury evidence regarding what had transpired at the time Perez confessed, and the evidence of what the defendants had known at the time the initial police investigation took place. *Aguirre*, 382 Ill. App. 3d at 100. The appellate court also rejected the defendants' argument that the evidence of Perez's confession improperly injected the plaintiffs' guilt or innocence with the issue of whether the defendants had probable cause to prosecute the plaintiffs. *Aguirre*, 382 Ill. App. 3d at 100. The appellate court found that in both instances any alleged prejudice or confusion was mitigated by the circuit court's proper instruction to the jury that in considering probable cause, " 'it is the state of mind of [the] one initiating the prosecution and not the actual facts of the case or guilt or innocence of the accused that is at issue.' " *Aguirre*, 382 Ill. App. 3d at 100.

While the reasoning in *Aguirre* was applied to affirm the trial court's admission of the third-party confession, it must likewise, in this case, lead to the conclusion that the circuit court abused its discretion in not permitting plaintiff to introduce at trial evidence of Simon's confession and the testimony of his wife Inez regarding her knowledge of the shooter.

The record reveals that this entire case centered on the credibility of the witnesses at trial. While on one hand the two police officers, Salvatore and Gray, maintained that the statements they obtained from four witnesses, Williams, Taylor, Edwards and Beckwith, during their investigation of the crime provided them with sufficient probable cause to institute the criminal proceedings against the plaintiff, the plaintiff's entire case centered on establishing that these witnesses had been manipulated by the police into making false statements and identifications against the plaintiff. Specifically, on one hand the two officers, Salvatore and Gray, testified that they based their probable cause determination on: (1) the statements of two eyewitnesses (Taylor and Edwards) who identified the plaintiff as the shooter; (2) the statement of Williams that the plaintiff committed a robbery at gunpoint moments before the murders; and (3) the statement of Beckwith, who identified the plaintiff as leaving the scene of the murders just after they occurred. On the other hand, all of the eyewitnesses who made incriminating statements against the plaintiff, except for Williams,

who was deceased at the time of the trial, testified that they never actually identified the plaintiff as the shooter and that they were in fact either coerced by the police or promised something in return for providing statements against the plaintiff.

Specifically, at trial Taylor testified that he never told the officers that he saw the shooter. He further averred that during questioning at the police station he was kept in a dimly lit room for about 10 hours and that Officer Salvatore threatened him by pounding a flashlight into the palm of his hand and by telling him that he should be more afraid of the police than of the plaintiff. Taylor further testified, contrary to the testimony of the two officers, that he never asked the officers to go see his grandmother and that the officers never permitted him to go to a nursing home. He also denied that his friend, Williams, ever told him to tell the officers "what he really saw." This statement was corroborated by the testimony of one of the defendants, Detective Perry, who averred that during her questioning of Williams, Williams never told her that Taylor had seen the shooting. Taylor also testified that the only reason he testified against the plaintiff in his 1982 trial was because Officer Salvatore brought him to the courthouse prior to trial to speak with an assistant State's Attorney (ASA) about a homicide he was "supposed to have witnessed," and because he also took him to the courthouse on the date of the trial to testify against the plaintiff. Taylor averred that when he attempted to leave the courthouse on the day of the trial, he was prevented from doing so by a man who followed him out of the courtroom and told him it was in his "best interest to testify." Taylor specifically stated that he testified falsely because he was afraid of Officer Salvatore and because the ASA told him that "he was making the right decision to testify" and that "the only way he would get out of the situation was to go with the flow."

Similarly, Edwards testified that the entire portion of the 1982 police report attributed to him was inaccurate. He specifically pointed out that when he was questioned by the police on the night of the shooting, he never told them that he observed the plaintiff shoot the victims. Edwards explained that he lied at the grand jury hearing against the plaintiff because at that time he had an assault charge pending against him, which was dropped after he testified.

With respect to Williams' testimony regarding the plaintiff's robbing him of $2 at gunpoint minutes before the shooting, the record reveals that it was rebutted by the testimony of both Detective Perry and Sheffield Younger. Sheffield Younger testified that when he was questioned by the police officers soon after the shooting in 1982, he told them that on the night of the shooting, he spent the entire evening

standing next to his friend, Williams, and that no one approached them or tried to take money from them. In addition, Officer Perry testified that when she questioned Williams, he never told her that the plaintiff took money from him but, rather, asserted that because he had no money, the plaintiff merely told him he was "getting a lucky break" and walked away. Moreover, Officer Perry testified that Williams never told her that he observed plaintiff in the bleachers before or after the shooting. Finally, Perry testified that Williams told her that even though he was almost robbed at gunpoint, he never called the police but just went swimming.

Finally, with respect to Beckwith's testimony that in 1982 after the shooting he told the officers that before the shooting he observed four individuals in the bleachers, one of whom he recognized as the plaintiff, and that after the shooting he saw two men leaving the scene, one of whom was the plaintiff, Officer Salvatore himself admitted that these statements were not contained in his 1982 police report and that if Beckwith had made these statements to him during the investigation, he would have written them down. Moreover, the record reveals that Beckwith did not testify at the plaintiff's 1983 criminal trial and that he was never subpoenaed to do so.

Under the above detailed facts of the case, it is undeniable that the trial focused on the credibility of the plaintiff's recanting witnesses, who alleged that the police officers were in collusion and orchestrated the plaintiff's arrest and prosecution without probable cause. Ordinarily, the dominant credibility issue with respect to recanted testimony is whether to believe the recantation and decide that the original testimony must be false, or *vice versa*, to believe the original testimony and conclude that the recantation is false. However, when there is proof of the actual innocence of the criminal defendant against whom the recanting witnesses originally testified, the possibility and certainty of the likelihood that the original testimony was true and that the recantation is false dissolve. Actual innocence of the party accused establishes conclusively that the original testimony when offered was incorrect. Consequently, the introduction of evidence regarding Simon's confession, followed by his guilty plea and subsequent conviction of the Washington Park murders, would have established with a high degree of conclusivity that Taylor had testified falsely at the plaintiff's 1983 trial and that Taylor, Edwards and Beckwith had all given false information to the police during the 1982 investigation. This in turn would have given substantially greater credence to the claim of these witnesses and informants that their false testimony was attributable to police coercion, intimidation or promises. The alternative would be to presume the coincidence that

each of these witnesses made the same error in observation or entered into an independent course of collusion to imprison the plaintiff.

Without proof of actual innocence there would be a third alternative, namely, that the original testimony was true, with the recanting testimony being false, without either police coercion or collusion of the parties. The establishment of actual innocence leaves no room for the possibility that the original testimony might be true after all but compels the conclusion that the original testimony was false. The inquiry then focuses on the factors that caused such false testimony to be given in the first place and elevates the likelihood that such false testimony was induced by police coercion or enticement. As such, this evidence was highly relevant to any determination by the jury with respect to the question of whether the commencement of the criminal proceedings against the plaintiff lacked the underpinnings of probable cause and whether it was the product of bad faith and malice on the part of the police.

Moreover, Simon's confession and Inez's testimony that she was afraid of her husband were relevant to determining the adequacy and reasonableness of the police's investigation, prior to prosecuting the plaintiff, which is a factor to be considered in determining the existence of probable cause. See W. Prosser, Torts §119, at 841-42 (4th ed. 1984) ("[Probable cause] includes first of all an honest belief in the guilt of the accused, since the reasonable man will not prosecute another whom he does not believe to be guilty; and this belief must be one as to the fact of guilt, rather than as to the possibility of securing a conviction. While it need not approach absolute certainty as to the facts, and it is not inconsistent with a considerable element of doubt, it must be more than mere conjecture or unfounded suspicion. Beyond this, the belief must be supported by appearances known to the defendant at the time ***. The appearances must be such as to lead a reasonable man to set the criminal proceeding in motion. The defendant is not necessarily required to verify his information, where it appears to be reliable; but where a reasonable man would investigate further before beginning the prosecution, he may be liable for failure to do so. All such factors as the reliability of the source, the availability of further information and the difficulty of obtaining it, the reputation of the accused, and his opportunity to offer an explanation, and the apparent necessity of prompt action, are to be considered in determining whether it was reasonable to act without seeking verification"). In that respect, the record reveals that the officers did not bring Inez or Simon to the police station for questioning, while they did so with the other witnesses who provided them with information incriminating the plaintiff. Moreover, in her pretrial deposition, Inez

testified that one of the reasons she did not volunteer any information to the officers who came to question her at home on August 14, 1982, was because her husband was standing right next to her and she was afraid of him. In addition, based on her observation of the shooting, Inez could have testified that she never saw plaintiff in Washington Park on the night of the murders. This evidence would have corroborated the plaintiff's assertion in the cause at bar, which was attacked at trial by the defendants, that he was never at the park on the night in question.

Furthermore, there is evidence in the record that indicates that the police officers were not as thorough with their investigation as even ASA Kerstein would have liked and which he detailed in his memorandum attached to the felony warrant approval. Specifically, there is testimony that after Younger told the police that Williams was never robbed on the night of the shooting, the police did not ask Younger to sign a statement, and never reinterviewed him to determine which of the two witnesses was speaking the truth.

As stated in *Aguirre*, any prejudice or confusion that might have resulted to the defendants by the admission of the aforesaid evidence could have been mitigated by instructions on the part of the trial court to the jury that, in considering probable cause, " 'it is the state of mind of [the] one initiating the prosecution and not the actual facts of the case or guilt or innocence of the accused that is at issue.' " *Aguirre*, 382 Ill. App. 3d at 100. As such, we conclude that it was unreasonable for the circuit court to bar the introduction of the evidence at trial. *Aguirre*, 382 Ill. App. 3d at 100-01.

The majority in the exercise of its own initiative has discovered that after the conclusion of the plaintiff's malicious prosecution trial, Simon, by way of a postconviction petition, attempted to retract his confession. In his attempted retraction in 1999, Simon contended that his confession and plea were coerced and enticed by false promises of various rewards, such as book and movie deals made by professor David Protess, director of the Medill Innocence Project at Northwestern University, who was responsible for challenging the plaintiff's conviction. This petition was summarily dismissed by the trial court as frivolous and patently without merit before the commencement of the plaintiff's malicious prosecution trial. A subsequent petition was filed by Simon after the conclusion of the plaintiff's malicious prosecution trial, alleging actual innocence. This petition was disallowed as a successive postconviction petition since it was predicated upon purported evidence which had been available to Simon when he filed his initial petition and therefore did not meet the cause and prejudice test under *People v. Pitsonbarger*, 205 Ill. 2d 444, 458, 793 N.E.2d 609,

620-21 (2002) (see also 725 ILCS 5/122—3 (West 2002)). Obviously, these attempted recantations by Simon do not impact on the relevance and admissibility of his original confession. Nor, given the reasons urged by Simon in support of his retractions, namely, that his confession was elicited by promises from the individuals involved in the Northwestern University Innocence Project, would these attempted recantations dilute the probative value of Simon's confession in establishing the plaintiff's actual innocence. It is worth noting that the defendants in opposing the plaintiff's malicious prosecution claim did not even attempt to introduce or argue the Simon retractions either at the trial level or on appeal. Moreover, while the majority attempts to take judicial notice of them, no such request was ever made by either of the parties, including the defendants.

For the foregoing reasons, I respectfully dissent.